[S. F. No. 15700. In Bank.—May 26, 1937.]

CITY OF SAN MATEO (a Municipal Corporation) et al., Petitioners, v. THE RAILROAD COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

2

Ernest A. Wilson, City Attorney of San Mateo, Albert Mansfield, City Attorney of Redwood City and San Carlos, Kirkbride & Wilson and William J. Locke for Petitioners.

Ira H. Rowell, Roderick B. Cassidy and Gilmore Tillman for Respondent.

SHENK, J.—The cities of San Mateo, Redwood City and San Carlos have joined in a petition to review an order of the respondent Railroad Commission which requires the closing of or the separation of grades at five railroad grade crossings located within the boundaries of said cities.

The crossings are formed by the intersection at grade of streets or roads and the right of way of the Southern Pacific Company. A fact-finding committee composed of representatives of the Peninsula grade crossing conference, a civic organization, state chamber of commerce, Southern Pacific Company, the cities of San Mateo, Redwood City, Belmont, San Carlos, San Mateo County planning commission, and the engineering department of the Railroad Commission, made a comprehensive and thorough survey of crossing conditions in this area and joined in a report on the subject which was made a part of the record before the commission. Thereafter a complaint was filed with the Railroad Commission at the instance of Peninsula grade crossing conference, seeking action on the part of the commission to the end that fatalities due to accidents at the numerous grade crossings between

the northerly limits of the city of San Mateo and the southerly limits of Redwood City be minimized. After notice to the railroad company and the municipalities involved, the commission ordered the closing of or the separation of the grades at, Thirty-ninth Avenue in San Mateo, Eaton Road in San Carlos, and Beech Street in Redwood City. It directed the Southern Pacific Company forthwith, by the installation and maintenance of suitable gates or other structures, physically to close to public use the crossings known as Mills Avenue in San Mateo and Hull crossing in San Carlos, subject to any private rights of easement or contractual obligation of the railroad company. ██ The commission found that the ways traversing the right of way at these points had not been formally dedicated to public use and that the evidence of public user was insufficient to create a public crossing. No question of the propriety of this finding is raised. It is a finding of fact and is not open to review. (Sec. 67, Public Utilities Act, Stats. 1915, p. 115.)

The validity of the commission's order in connection with the Thirty-ninth Avenue crossing in San Mateo, the Eaton Road crossing in San.Carlos, and the Beech Street crossing in Redwood City is specially questioned by the petitioners. At each of these crossings the railroad right of way is traversed by a public city street or way which connects El Camino Real, a state highway parallel and contiguous to the railroad right of way, with a parallel county road on the opposite side of the railroad right of way. The Thirty-ninth Avenue and Beech Street crossings continue beyond the respective connected highways.

It appeared in the proceedings before the commission that there are thirty grade crossings within the nine-mile strip involved. One-half of them carries ninety per cent of the traffic which crosses the tracks. As to the three crossings dedicated to public use which are here involved, the commission found from the record of fatal accidents in the area that grade-crossing conditions were bad and that those conditions could be greatly improved by concentrating traffic at the minimum number of crossings consistent with public convenience and providing adequate protection at the crossings to be used. It also found that the limited use by the public of the crossings affected by the order indicated that public convenience did not require their continuance; that the

hazard to public safety which they represented required that they be closed; and that their closing would greatly reduce the hazard to life and property. The commission directed that the railroad company "forthwith, by the installation and maintenance of suitable physical structures, and/or any change of the existing grade" physically close such crossings to public use. The order also directed the members of the council of each city to do all things necessary or required under the law to divest the area of such public streets as traversed the railroad right of way of its public character.

It is beyond question here that the findings of the commission of the necessity, in the interest of the public safety, for the closing of the grade crossings involved have been established. The question then is as to what public authority has the power to compel it. The commission asserts power to that end under the provisions of the Constitution and the Public Utilities Act. The constitutional sections relied upon are section 22 of article XII as amended in 1911 and section 23 of the same article as amended in 1914. Section 22 as amended enlarged the power of the commission in the regulation and control of railroad companies and in addition contained the following comprehensive grant of power to the legislature:

"No provision of this Constitution shall be construed as a limitation upon the authority of the Legislature to confer upon the Railroad Commission additional powers of the same kind or different from those conferred herein which are not inconsistent with the powers conferred upon the railroad commission in this Constitution, and the authority of the Legislature to confer such additional powers is expressly declared to be plenary and unlimited by any provision of this Constitution."

Again in section 23 is found the following very broad grant of power to the legislature:

"The railroad commission shall have and exercise such power and jurisdiction to supervise and regulate public utilities, in the State of California, and to fix the rates to be charged for commodities furnished, or services rendered by public utilities as shall be conferred upon it by the legislature, and the right of the legislature to confer powers upon the railroad commission respecting public utilities is hereby declared to be plenary and to be unlimited by any provision of this Constitution."

■ The powers thus conferred have been declared to be unlimited, provided the legislative act conferring additional powers on the commission shall relate to matters cognate and germane to the regulation of public utilities. (*Pacific Tel. & Tel. Co.* v. *Eshleman,* 166 Cal. 640 [137 Pac. 1119, Ann. Cas. 1915C, 822, 50 L. R. A. (N. S.) 652].)

■ Under the foregoing authority of the Constitution and the Public Utilities Act, the commission since 1911 has had the power conferred by section 43 (b) of the act to abolish existing grade crossings or to order the separation of grades at such crossings. (Stats. 1911, Ex. Sess., pp. 18, 40.) That section in subparagraph (a) has likewise since 1911 prohibited the establishment of new grade crossings without the consent of the commission. Subparagraph (b) as originally enacted has authorized and as now in effect authorizes the commission to order the elimination of existing grade crossings or to compel a separation of grades at such crossings and make elaborate provisions for accomplishing those results. The power of the commission to compel a separation of grades at existing crossings was recognized in *Civic Center Assn.* v. *Railroad Com.,* 175 Cal. 441 [166 Pac. 351], and *S. H. Chase Lumber Co.* v. *Railroad Com.,* 212 Cal. 691 [300 Pac. 12]. Like power to compel the closing of existing grade crossings upon a proper showing and upon the conditions stated in the Chase Lumber Company case as to the rights of private property owners must be deemed to be lodged in the commission unless the legislature has been deprived of the power to confer it by the following proviso in section 23 of article XII of the Constitution as amended in 1914:

"Provided, however, that this section shall not affect such powers of control over public utilities as relate to the making and enforcement of local, police, sanitary and other regulations, other than the fixing of rates, vested in any city and county or incorporated city or town as, at an election to be held pursuant to law, a majority of the qualified electors of such city and county, or incorporated city or town, voting thereon, shall vote to retain, and until such election such powers shall continue unimpaired . . . "

■ It is the contention of the petitioners that the foregoing proviso had the effect of depriving the legislature of all power to confer upon the commission authority to abolish grade crossings in said cities for the reason, so it is claimed,

that the power over the subject matter was and is vested in said municipalities.

The history of the proviso indicates that it was inserted at the instance of representatives of certain freeholders' charter cities who were apprehensive lest powers then vested in corporate municipal bodies be improvidently taken away. The argument sent to the voters at the election at which the constitutional amendment was submitted and adopted referred to the proviso as reserving to cities "those powers now vested in it", and added the following: "This provision was deemed advisable, since our cities are now possessed of certain constitutional powers to the arbitrary revocation of which they might be reluctant to submit." The important question now is as to the significance to be attached to the term "vested" as used in the proviso. What power should be deemed to be vested in municipalities thereunder and to what particular time should the reservation of such vested power relate?

▉ The term "vested" found in the proviso as originally adopted in 1911 must be deemed to refer to "such powers of control over" public utilities as were then lodged in municipalities and such as were beyond the power of the legislature to withdraw without the cities' consent. Whatever vested power the municipalities of the state enjoy they derive from the state Constitution and to the extent there permitted. And the only municipalities in the state vested with immunity from control of the legislature are freeholders' charter cities organized under section 8 of article XI of the Constitution. The immunity from legislative control is limited to municipal affairs and to the extent specified by sections 6 and 11 of the same article. With respect to other matters charter cities are subject to and controlled by general laws. ▉ Municipalities organized under the general Municipal Corporations Act possess no powers which are not subject to and controlled by general laws, and do not enjoy "vested" powers within the meaning of the proviso of section 23 as originally adopted in 1911. The same conclusion must be drawn as to the effect of the amendment of the proviso in 1914. The amendment qualified the powers of control which should continue by limiting them to such "as relate to the making and enforcement of local, police, sanitary and other regulations, other than the fixing of rates".

The obvious purpose of the amendment of 1914 was to vest in the Railroad Commission the power to fix the rates of all privately owned public·utilities in the state whether the same be located within or without or partly within and partly without a municipality.

Since the adoption of the Constitution of 1879 section 11 of article XI has provided that ''any county, city, town or township may make and enforce within its limits all such local, police, sanitary, and other regulations as are not in conflict with general laws''. This power has been available to all cities. As to such regulations as come within the definition of municipal affairs the city could remove itself from the operation of general laws by organizing under a freeholders' charter, but all cities organized under general law have been and are subject in their activities to the restriction that the regulations under that section must not be in conflict with general laws. Unchartered cities may adopt regulations, local, police and sanitary in character, which are not in conflict with general laws. In a limited sense such power is vested in the municipality but always subject to the power of the legislature to wipe it out by a conflicting general law on the same subject. ■ From the history of the proviso in question and its relation to other provisions of the Constitution, it must be concluded that the term ''vested'' as used in the proviso, referred to powers of control over public utilities (1) such as related to the making and enforcement of local, police, sanitary and other regulations in chartered cities (other than the fixing of rates) ; (2) such as related to municipal affairs; and (3) such as had been assumed by such cities by appropriate charter provision. This was the holding, and properly so, in *Mountain View* v. *Southern Pac. R. R. Co.*, (1934) 1 Cal. App. (2d) 317 [36 Pac. (2d) 650].

The history and context of the proviso in section 23 also indicate that the reservation to cities therein contained was intended to relate to such powers of control as were vested in cities at the time the proviso was adopted. This is shown by other language of the proviso authorizing a vote on the question of what powers the city desired to ''retain'' and that until such powers be surrendered by popular vote ''such powers shall continue unimpaired''. If such powers were not then in existence there was nothing to retain and nothing to continue in effect. Also it appears that at the special

session held soon after the adoption of the constitutional amendment in 1911 the legislature enacted a statute providing in elaborate fashion the procedure to be followed in submitting to a vote of the electors of cities the question of the retention or surrender of powers of control over public utilities. (Stats. Ex. Sess. 1911, p. 168.) The entire statute proceeds upon the theory that the subject matter of retention and surrender relates to powers then possessed by municipalities subject to the operation of the proviso. This court on numerous occasions has referred to the powers deemed vested under the constitutional proviso as those which were vested at the time of the adoption thereof and of the adoption of the Public Utilities Act. (*Title Guarantee & Trust Co.* v. *Railroad Com.*, 168 Cal. 295 [142 Pac. 878, Ann. Cas. 1916A, 738]; *Oro Elec. Corp.* v. *Railroad Com.*, 169 Cal. 466 [147 Pac. 118]; *Los Angeles* v. *Central Trust Co.*, 173 Cal. 323 [159 Pac. 1169]; *Civic Center Assn.* v. *Railroad Com., supra.*)

The city of San Carlos was organized under general law as a city of the sixth class in 1925. In 1911 and 1914 the cities of San Mateo and Redwood City were organized and existing by virtue of general law. San Mateo adopted a freeholders' charter in 1923, and Redwood City took similar action in 1929. Until their charters were adopted those cities were subject to and controlled by general laws. At the time of the adoption thereof those cities gathered unto themselves and became vested with the control of affairs municipal, but it does not follow that thereby those cities were vested with such powers in 1911 when the constitutional proviso was adopted or in 1912 when the Public Utilities Act was passed. The city of San Carlos therefore has been and is subject to the provisions of section 43 of the Public Utilities Act as originally enacted and as amended in 1933. The cities of San Mateo and Redwood City were likewise subject to said section 43 as a general law until the adoption of their charters and are still subject thereto, including the amendment of 1933, if the subject matter of the elimination of railroad grade crossings is germane to the subject of the regulation of public utilities in this state.

In these days of heavy automobile traffic the hazards to life and limb by reason of the numerous railroad crossings at grade is a matter of great public concern. To eliminate

unnecessary grade crossings and to minimize the hazards created thereby has become a definite governmental state policy. To effectuate the desired results it is necessary that some public authority be vested with power to compel compliance with regulatory orders. The Constitution and statutes have vested that power in the Railroad Commission. The power so vested has been recognized and approved as to the separation of grades at railroad crossings even in cities organized under a freeholders' charter which had appropriately assumed control of their municipal affairs, prior to the adoption of the constitutional proviso. (*Civic Center Assn.* v. *Railroad Com., supra.*) It was also held in that case that the question of the elimination of grade crossings in such a city by providing a separation of grades was a matter of state concern as distinguished from a municipal affair. Such an application of the proviso as was made in that case would not have been proper except on the theory that the elimination of railroad crossings at grade is also germane to the subject of railroad regulation in this state. Whether the question of the elimination of grade crossing by a physical closing thereof without providing the alternative of a separation of grades to afford continuance of the public use of the highway approaches to the crossing has been reserved under the proviso to such a chartered city and whether such a physical closing in such a city is a matter of state concern are not involved here. It must be concluded, however, that the subject of abolishing such grade crossings by the physical closing thereof is germane to the regulation of a railroad corporation performing state-wide or more than local service; that the Railroad Commission has been vested with such power of regulation and control by the Constitution and by section 43 (b) of the Public Utilities Act, and that the commission's orders in that behalf are binding on the authorities of cities now organized under general law and of those cities which were organized under general law at the time the proviso in section 23 of article XII of the Constitution was adopted, even though such cities were thereafter organized under freeholders charters. The cities of San Mateo and Redwood City fall within the latter classification.

The petitioners rely on *Red Bluff* v. *Southern Pac. Co.*, 44 Cal. App. 667 [187 Pac. 152]. There the action was by the

city to have the company remove obstructions placed upon a crossing at grade under a contract giving permission for the temporary occupancy thereof. It was held that the city had the right to bring an action to enforce the contractual obligation to remove the obstructions upon the termination of the contract. The defense that the Railroad Commission had *exclusive* jurisdiction in the matter was rejected. The commission was not seeking to exercise any power vested in it with respect to said crossing. Anything said in the opinion in that case which is contrary to the views herein expressed is necessarily disapproved.

In the proceedings before the commission several persons owning real property in the vicinity filed objections to the closing of the crossings on the ground that such closing would deprive them of rights of property without an appropriate ascertainment and payment of damages in accordance with the rule stated in *S. H. Chase Lumber Co.* v. *Railroad Com., supra, Eachus* v. *Los Angeles Elec. Ry. Co.,* 103 Cal. 614 [37 Pac. 750, 42 Am. St. Rep. 149], and similar cases. The contractual rights and obligations of property owners and the railroad company with respect to the two private crossings ordered to be closed are not adversely affected by the order for the reason that the order was made expressly subject to those rights. Whether the real property of the objecting owners abuts on any of the public area ordered to be closed does not appear in the record certified to us by the commission. Nor does that fact, if it be the fact, appear in the decision and order of the commission. We therefore assume that property other than that of the railroad company does not directly abut upon any of the area directed to be closed, and that the private property in question is contiguous to either the county or the state highways which are connected by such public crossings. If such be the case no obstruction to the ingress and egress from those highways has been created by the order of the commission. The nature of such private property rights or easements has been defined as the right of an *abutting* owner to light, air and access to the street (20 Cor. Jur. 689, 690, and cases cited), and as "an easement in the street fronting upon his lot, for the purposes of ingress and egress". (*Eachus* v. *Los Angeles Elec. Ry. Co., supra.*) It does not appear that any such rights of the objecting property owners have been taken from them. Certain it is that the commission has not at-

tempted to adjudicate such rights, if any exist, and the property owners objecting before the commission are not parties to the present proceeding. So far as the record shows the objectors have mistaken the character of their right to the use of the crossing area, which is in the nature of a public rather than of a private or property right.

The order is affirmed.

Thompson, J., Curtis, J., Langdon, J., and Seawell, J., concurred.