[S.F. No. 22766. In Bank. May 26, 1971.]

ORANGE COUNTY AIR POLLUTION CONTROL DISTRICT,
Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
SOUTHERN CALIFORNIA EDISON COMPANY,
Real Party in Interest.

946

## COUNSEL

Adrian Kuyper, County Counsel, John F. Powell, Deputy County Counsel, for Petitioner.

John D. Maharg, County Counsel (Los Angeles), David D. Mix, Assistant County Counsel, Bruce A. Beckman and Loyd P. Derby as Amici Curiae on behalf of Petitioner.

Mary Moran Pajalich, Sheldon Rosenthal, J. Calvin Simpson and James A. Blumberg for Respondent.

Rollin E. Woodbury, Harry W. Sturges, Jr., William E. Marx, O'Melveny & Myers and Pierce Works for Real Party in Interest.

## OPINION

**PETERS, J.**—We are presented in this case with an issue of some importance to urban California: Whether the authority conferred upon the Public Utilities Commission to grant permission to construct and operate privately owned electric generating units supersedes, in cases of conflict, the authority conferred upon an air pollution control district to condition construction of such units upon compliance with district emission controls.

We conclude that neither the commission nor the district has exclusive or paramount authority. Subject to judicial review provided by law, a utility must comply with the rules and regulations of both the commission and the district.

Both the commission and the various districts have jurisdiction over the construction of electric generating units. This jurisdiction is set forth in the statutory schemes governing each agency.

The commission has historically been the agency charged by the Legislature with regulation of privately owned public utilities. Some of the commission's powers are derived by direct grant from the Constitution (art. XII, 2d par. of § 22); others may be conferred by the Legislature, which is given plenary power to confer additional powers upon the com-

mission. (Art. XII, 3d par. of § 22, and § 23; *People* v. *Western Air Lines, Inc.* (1954) 42 Cal.2d 621, 634 [268 P.2d 723].)

The Legislature has used its authority to confer broad powers upon the commission. The commission "may supervise and regulate every public utility in the State" (Pub. Util. Code, § 701), may order construction or modification of facilities or equipment (Pub. Util. Code, §§ 761, 762, 768), and may fix standards of service to be furnished (Pub. Util. Code, § 770). No privately owned utility may construct an electric generating unit or plant without first obtaining a certificate of public convenience and necessity from the commission. (Pub. Util. Code, § 1001.) Finally, public utilities are directed to obey and comply with all commission orders as to any matter affecting its business as a public utility. (Pub. Util. Code, § 702.)

Air pollution control districts were created by the Legislature in 1947 to protect the state's "primary interest in atmospheric purity" (Health & Saf. Code, § 24198).[1] The air pollution control district is *the* agency charged with enforcing both statewide and district emission controls.[2] (§ 24224.) The districts may also require that a permit be obtained before any building is constructed or equipment is erected or operated, and may condition the permit upon a showing that the proposed facility will comply with applicable emission controls. (§§ 24263, 24264.)

The district's enforcement powers are broad. The district air pollution control officer may enter any building or premises to ascertain compliance with emission controls. (§ 24246.) He may require an applicant for or holder of any permit to provide information disclosing the nature, extent, quantity, or degree of air contaminants which are or may be discharged. (§ 24269.) A permit may be denied or suspended for refusal to furnish information or failure to comply with applicable emission standards. (§§ 24264, 24270, 24276.) Failure to obtain a permit, operate a facility in accord with the terms of a permit, or otherwise obey *any* order, rule, or regulation of an air pollution control district constitutes a misdemeanor.

---

[1]Unless otherwise specified, all references to code sections hereafter are to the Health and Safety Code.

[2]Among these provisions of statewide application is Health and Safety Code, section 24243, which provides: "A person shall not discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance or annoyance to any considerable number of persons or to the public or which endanger the comfort, repose, health or safety of any such persons or the public or which cause or have a natural tendency to cause injury or damage to business or property."

The district is empowered to make and enforce emission controls tailored to the peculiar pollution conditions of the district. (Health & Saf. Code, § 24260.)

(§§ 24253, 24279, 24280, 24281.) Any violation of statewide or district regulations by any state or local governmental agency or public district may also be enjoined in a civil action. (§ 24254.)

Southern California Edison Company, real party in interest herein, sought permission to construct and operate two new steam electric generating units (utilizing fossil fuels) at its Huntington Beach generating station. On August 1, 1969, Edison applied to the commission for a certificate of public convenience and necessity covering its proposed construction. On September 30, 1969, Edison similarly applied to the Orange County Air Pollution Control District for a permit covering the proposed new units.

The district took action on Edison's application first. On October 13, 1969, its control officer requested that Edison furnish further information regarding the new units. The information was submitted by letter on November 14. On November 18, 1969, the control officer denied the application, stating that the information submitted was not adequate to show that the units would not violate Health and Safety Code section 24243.[3]

On November 28, 1969, Edison requested an appellate hearing on its application before the Orange County Air Pollution Control District Hearing Board. The first hearing was held on December 22, 1969.

On December 23, 1969, the district's governing board adopted rule 67, which sets forth specific emission control requirements applicable to all nonmobile fuel burning equipment.[4] The emission requirements of rule 67 are identical to those previously adopted by the Los Angeles district. Petitioners allege in their briefs that identical rules have now been adopted by all other air pollution control districts in the South Coast Air Basin, of which Orange County is a part. This allegation is not denied. On December 29, 1969, the control officer denied Edison's original appli-

---

[3]Rule 20 of the Orange County Air Pollution Control District provides that proposed facilities must comply with sections 24242 and 24243 of the Health and Safety Code.

[4]Rule 67 in pertinent part provides: "A person shall not build, erect, install or expand any nonmobile fuel burning equipment unit unless the discharge into the atmosphere of contaminants will not and does not exceed any one or more of the following rates: (1) 200 pounds per hour of sulfur compounds, calculated as sulfur dioxide ($SO_2$); (2) 140 pounds per hour of nitrogen oxides, calculated as nitrogen dioxide ($NO_2$); (3) 10 pounds per hour of combustion contaminants as defined in Rule 2(0) and derived from the fuel. [¶] For the purpose of this rule, a fuel burning unit shall be comprised of the minimum number of boilers, furnaces, jet engines or other fuel burning equipment, the simultaneous operations of which are required for the production of useful heat or power."

cation on the independent ground that the proposed facility would not comply with rule 67.

The district hearing board continued to hold hearings on Edison's application on December 29 and 30, 1969. On June 17, 1970, the hearing board issued its decision sustaining the control officer's denial of the requested permit "under authority of Rule 20, and, independently and separately thereof . . . under the authority of Rule 67." No judicial review of this decision was requested, although such review is provided for pursuant to sections 24322 and 24323. (Cf. § 24291.)

The commission held hearings on Edison's application on 19 days between December 17, 1969, and March 9, 1970. The district participated in these hearings, presenting evidence and argument in opposition to the application. The commission was aware that Edison's application had been denied by the district based on rules 20 and 67. Nevertheless, on June 23, 1970, a week after the hearing board's final decision, the commission granted Edison's application and further directed Edison to begin construction immediately. (Decision No. 77400, June 23, 1970, rehearing denied, Decision No. 77552, July 28, 1970.)

In its decision the commission did not contradict the district's finding that Edison would not comply with rule 67. The commission recognized, as it must, that sections 24224, 24260, 24263, and 24264, on their face give the district jurisdiction to condition permission to construct a power plant facility upon compliance with district rules and regulations. Without discussion or citation, however, the commission characterized this statutory authority as that of a "local agency."

Having made this assumption, the commission then asserted that its jurisdiction was paramount: "The cases are clear that in matters involving more than strictly local interest the broader regulatory authority, in this case the State through its Public Utilities Commission, should prevail. (*California Water & Telephone Co.* v. *County of Los Angeles,* 253 Cal. App.2d 16 [61 Cal.Rptr. 618]; *Los Angeles Ry. Corp.* v. *Los Angeles,* 16 Cal.2d 779 [108 P.2d 430].) [¶] As to concurrent jurisdiction, it may well exist as to some matters but . . . if . . . there is a direct confrontation with the jurisdiction exercised by this Commission . . . the jurisdiction of this Commission in the matter is either exclusive or paramount. That was essentially the determination made in the *California Water & Telephone Co.* and the *Los Angeles Ry. Corp.* cases."

█ The commission correctly stated that local ordinances are controlled by and subject to general state laws and the regulations of statewide agencies regarding matters of statewide concern. Accordingly, the com-

mission has been held to have paramount jurisdiction in cases where it has exercised its authority, and its authority is pitted against that of a local government involving a matter of statewide concern.[5]

Where its jurisdiction conflicts with *other* than a local agency, commission directives have not been given such controllng effect. The commission, for example, has broad authority to promote the safe operation of utilities.[6] Yet compliance with commission directives does not preclude a jury's finding that the commission's standards did not constitute a minimum standard of reasonable care. (See, e.g., *Sickles* v. *Mt. Whitney Power & Elec. Co.*, 177 Cal. 278, 280 [170 P. 599]; *Dragash* v. *Western Pac. R.R. Co.*, 161 Cal.App.2d 233, 241 [326 P.2d 649]; *Lozano* v. *Pacific Gas & Elec. Co.*, 70 Cal.App.2d 415, 424 [161 P.2d 74].)

Perhaps an even more relevant issue is jurisdiction to regulate the health and sanitation of common carrier employees. While the commission has been said to have such jurisdiction (37 Ops.Cal.Atty.Gen. (1961) 31, 33), the Industrial Welfare Commission and the Division of Industrial Safety have been held to have *concurrent* jurisdiction over such matters. The Attorney General's opinion makes it clear that a common carrier must not only obtain an operating permit from the commission (Pub. Util. Code,

[5]On many occasions a matter which is local in geographical effect has been declared one of statewide concern, vesting paramount jurisdiction in the commission. Thus the business of supplying telephone service (and hence the right to control franchises) (*Pac. Tel. & Tel. Co.* v. *City of Los Angeles*, 44 Cal.2d 272, 280 [282 P.2d 36]), the construction and maintenance of telephone lines within a city (*Pac. Tel. & Tel. Co.* v. *City & County of S.F.*, 51 Cal.2d 766, 768 [336 P.2d 514]), and the control of city streets at railroad grade crossings (e.g., *City of Union City* v. *Southern Pac. Co.*, 261 Cal.App.2d 277, 279 [67 Cal.Rptr. 816]; *City of San Mateo* v. *Railroad Com.*, 9 Cal.2d 1, 9 [68 P.2d 713]; *Civic Center Assn.* v. *Railroad Comm.*, 175 Cal. 441 [166 P. 351]) have all been declared matters of statewide concern.

Similarly, in *California Water & Telephone Co.* v. *County of Los Angeles, supra*, 253 Cal.App.2d 16, relied upon by the commission, the court found that "the construction, design, operation and maintenance of public water utilities is a matter of state-wide concern. . . ." (*Id.*, at p. 30.) Hence, the court declared, the county's water ordinance must be void, since local legislation based on the police power is subject to general state law on matters of state-wide concern. (*Id.*, at pp. 27-28.) In the other case cited by the commission, *Los Angeles Ry. Corp.* v. *Los Angeles, supra*, 16 Cal.2d 779, 787, this court based its jurisdictional holding on the fact that "the regulation and operation of the street cars of the plaintiff over the territory involved is not a matter solely of local concern and is not, therefore, a municipal affair."

[6]The commission may order changes in a utility's facilities to promote the security or convenience of employees or the public (Pub. Util. Code, § 762), may fix the utility's rules, practices, and service to promote safety and other goals (Pub. Util. Code, § 761), and may direct a utility to use particular safety devices (Pub. Util. Code, § 768).

§ 1001) and comply with commission orders (*id.*, § 702), but must *also* comply with pertinent orders of the Industrial Welfare Commission or the Division of Industrial Safety. "[O]wners of common carriers must comply with the orders of *each* of the agencies so empowered." (37 Ops.Cal.Atty. Gen. at p. 36; italics added.)

When the Legislature considered the problem of air pollution control in 1947, it was no doubt aware of the jurisdictional limitations of local city and county governments. It is obvious that air is not a matter of purely local concern, and that the effective control of air pollution therefore should be undertaken on a nonlocal basis.

Division 20, chapter 2 of the Health and Safety Code (§§ 24198-24341) reflects the Legislature's concern. The Legislature declares that air quality is a matter of statewide importance (§ 24198), and that "*it is not practical or feasible to prevent or reduce such air contaminants by local county and city ordinances.*" (§ 24199, subd. (b), italics added.) The Legislature therefore creates a *new* agency to deal with this nonlocal matter, the air pollution control district. (§ 24200.) The district, through its officer, is to enforce all statewide standards concerning air pollution (§ 24224, subd. (a)) and all the orders, regulations, and rules prescribed by the district pursuant to section 24260. (§ 24224, subd. (b).) The Legislature expressly declares that all such rules are to be enforceable against "*any state or local governmental agency* or public district, or any officer or employee thereof," and any violation of an air pollution control district rule by such public agency or public district "may be enjoined in a civil action brought in the name of the people of the State of California." (§ 24254, italics added.)

Edison contends that districts have only local powers because they function only with the consent of the county board of supervisors (§§ 24202, 24205), have boundaries coextensive with that of the county (§ 24201), and have as officers the entire board of supervisors sitting ex officio (§ 24220). What is most significant, however, is the care with which the Legislature separated the legal status of the air pollution control district from that of the county. One prime reason that the board of supervisors must give in its resolution declaring that a district is needed is that "*it is not practical to rely upon the enactment or enforcement of local county and city ordinances to prevent or control . . . such pollution.*" (§ 24205, subd. (b), italics added.) The board must appropriate separate funds for the operation of the district (§ 24209), and deposit such funds in a separate treasury (*id.*), and record the appropriation as a legal charge against the county (§ 24210). The district is a separate corporate and political body from the county (§ 24211), with powers (inter alia) to sue and be sued,

hold or dispose of real property (§ 24212), and contract with the county or city to perform services (§ 24266). Since any contract between a district and a county would be made by two distinct political bodies composed of *identical* individuals, the Legislature *must* have intended the district to have a separate existence from that of the county.

The Legislature did not, it is true, intend to occupy the field completely in delegating powers over pollution to air pollution control districts. Aware that some local ordinances of cities and counties might be valid but for the Legislature's intervention, and not wishing to abrogate any power that local governments might have, the Legislature declared that it did not mean to prohibit the "enactment or enforcement by any county or city of any local ordinance stricter than the provisions of this article and stricter than the rules and regulations adopted [by a district]. . . ." (§ 24247; see also §§ 24248, 24249.) The possible validity of local pollution controls, however, obviously has no effect on the validity of district regulation of nonlocal matters.

It might be contended that the Legislature did not consider the possibility that air pollution control districts might regulate the emissions of public utilities. The possibility of such legislative inadvertence is unlikely. In upholding the Los Angeles County district's rule 67 as reasonable against the attack of a municipally owned utility,[7] the Los Angeles Superior Court noted that 44 percent of the nitrogen oxides discharged from nonvehicular sources in the county came from power plants. (Department of Water and Power v. Hearing Board of the Air Pollution Control District of the County of Los Angeles, Los Angeles Superior Court No. 971991, judgment entered July 9, 1970.) In the instant case it was estimated that 63 percent of the nitrogen oxides from nonvehicular sources in Orange County comes from Edison's power plants. It is extremely doubtful that the Legislature, in considering the need for districts with broad powers over private and public "persons," did not contemplate district regulation of power plants. There is also no evidence that the Legislature contemplated a patchwork structure in which districts might regulate the emissions of municipally owned utilities but not those of privately owned utilities, and in the absence of such evidence we are unwilling to reach such a result.

■ We conclude that the Legislature has established one statutory scheme for the general regulation of public utilities, another for the general regulation of air pollution. As in the field of industrial health and sanitation

---

[7]The commission has no jurisdiction over municipally owned utilities unless expressly provided by statute (*Los Angeles Met. Transit Authority* v. *Public Utilities Com.*, 52 Cal.2d 655, 661 [343 P.2d 913].)

(37 Ops.Cal.Atty.Gen. 31), the commission must share its jurisdiction over utilities regulation where that jurisdiction is made concurrent by another (especially a later) legislative enactment.[8] Here the Legislature has itself enacted specific emission control standards and has erected a comprehensive statutory structure for the adoption of further controls. These controls without doubt apply to public utilities. The Legislature has delegated enforcement of these emission controls to air pollution control districts. Where the district has found that a proposed or existing facility does not comply with applicable regulations, the commission may not order a utility to violate district rulings.

Rather, the Legislature has clearly provided a means by which the utility may challenge a district ruling. "Any person deeming himself aggrieved . . . may maintain a special proceeding in the superior court, to determine the reasonableness and legality of any action of the hearing board." (§ 24322.) The superior court, pursuant to Code of Civil Procedure section 1094.5, may then determine the validity of such action. (§ 24323.) If a court for any reason finds that a discharge in excess of that permitted by district rules and regulations is necessary, it may so order. (§ 24291.) There is thus little likelihood that the horrific nightmare envisioned by the commission—inadequate electrical service—will become a reality.

 The commission has acted in excess of its jurisdiction in purporting to overrule the Orange County Air Pollution Control District's denial of Edison's application. The order of the commission is annulled, without prejudice to Edison's right to seek judicial review of the district's order pursuant to section 24322.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

The petitions of the respondent and the real party in interest for a rehearing were denied June 23, 1971, and the opinion was modified to read as printed above.

---

[8]It is well settled that a later statute may supersede, modify, or so affect the operation of an earlier law as to repeal the conflicting earlier law by implication. (*Stafford* v. *Realty Bond Service Corp.,* 39 Cal.2d 797, 805 [249 P.2d 241]; *Lambert* v. *Conrad,* 185 Cal.App.2d 85, 93 [8 Cal.Rptr. 56].) "The courts assume that in enacting a statute the Legislature was aware of existing, related laws and intended to maintain a consistent body of statutes." (*Sacramento Newspaper Guild* v. *Sacramento County Bd. of Suprs.,* 263 Cal.App.2d 41, 54 [69 Cal.Rptr. 480].)