[No. C027953. Third Dist. May 4, 2000.]

CALIFORNIA APARTMENT ASSOCIATION et al., Plaintiffs and Appellants, v.
CITY OF STOCKTON et al., Defendants and Respondents.

**COUNSEL**

Robert B. Fien for Plaintiffs and Appellants.

Cynthia Humbert Neely and Richard K. Denhalter, City Attorneys, Bart J. Thiltgen, Assistant City Attorney, Susana Alcala Wood and Douglas H. Calkins, Deputy City Attorneys, for Defendants and Respondents.

**OPINION**

**BLEASE, J.**—Plaintiffs California Apartment Association and San Joaquin County Property Owners Association appeal from an order denying their petition for a writ of mandate to compel the City of Stockton (Stockton) and named respondents to comply with Public Utilities Code section 10009.6.[1]

Section 10009.6 prohibits a municipal corporation which owns or operates a public utility[2] from recovering from a residential property owner or subsequent tenant the overdue amounts for utility services provided a previous tenant under an account in that tenant's name.

Stockton has enacted ordinances which conflict with section 10009.6. Stockton claims the section is inapplicable to it as a charter city or, if applicable, is superseded by the ordinances which it claims are within the municipal affairs provisions of California Constitution, article XI, section 5.[3]

We will conclude that section 10009.6 is applicable to charter cities. The statutory term "municipal corporation" includes charter cities. We also conclude that section 10009.6 is not preempted as a municipal affair because it is within the paramount authority of the Legislature respecting public utilities under article XII.

We shall reverse the judgment and direct the entry of relief for plaintiffs.

---

[1] A reference to a section is to the Public Utilities Code unless otherwise specified.

[2] A " 'Public utility' . . . means the supply of a municipal corporation alone or together with its inhabitants . . . with water, light, heat, power, sewage collection, treatment, or disposal for sanitary or drainage purposes . . . ." (§ 10001.)

[3] Reference to an article is to an article of the California Constitution.

## FACTS AND PROCEDURAL BACKGROUND

Section 10009.6 was amended, effective April 8, 1996, to add subdivisions (b) through (e).[4] (Stats. 1996, ch. 24, § 1.) The subdivisions provide that a municipal corporation which owns or operates a public utility may not recover overdue charges from the owner of a residential property or a subsequent tenant for utility services provided a prior tenant under an account in the name of a previous tenant.

Stockton has enacted ordinances which make the owners of residential property responsible for the payment of utility services provided a tenant, including services for which the tenant has contracted under an account in the tenant's name.[5] Notwithstanding section 10009.6, Stockton continues to bill property owners for the amounts their tenants failed to pay for utility services for which they contracted.

Plaintiffs petitioned the superior court for a writ of mandate compelling Stockton to comply with sections 10009.6 and former section 10016, since

---

[4]Section 10009.6 currently provides in pertinent part as follows:

"(b) No municipal corporation owning or operating a public utility furnishing services for residential use to a tenant under an account established by the tenant shall seek to recover any charges or penalties for the furnishing of services to, or for the tenant's residential use from, any subsequent tenant or the property owner due to nonpayment of charges by a previous tenant. For this purpose, the term 'subsequent tenant' shall not include any adult person who lived at the residence during the period that the charges or penalties accrued. The municipal corporation may collect a deposit from the tenant service applicant prior to establishing an account for the tenant. The municipal corporation may not require that service to subsequent tenants be furnished on the account of the landlord or property owner unless the property owner voluntarily agrees to that requirement, nor may the municipal corporation refuse to furnish services to a tenant in the tenant's name based upon the nonpayment of charges by a previous tenant.

"(c) A public utility subject to this section may not demand or receive security in an amount that exceeds twice the estimated average periodic bill or three times the estimated average monthly bill.

"(d) In the event of tenant nonpayment of all or a portion of the bill, the deposit shall be applied to the final bill issued when service is terminated." (Stats. 1998, ch. 739, § 1.)

Prior to the amendment section 10009.6 provided, in what is now subdivision (a), that a public utility could require a deposit predicated solely on the tenant's creditworthiness.

[5](Stockton City Ords. Nos. 7-077.19 ["The owner of any single family, duplex or triplex premises is . . . responsible for the payments of any and all garden refuse service charges applicable to the premises . . . ."], 7-092.24 ["The owner of the premises . . . shall be responsible for payments of any and all sewer service charges applicable to the premises . . . ."], 7-833 ["The owner of any premises is . . . responsible for payment of any and all storm water service charges applicable to the premises . . . ."], 9-709.6 ["The owner of any premises is . . . responsible for the payments of any and all water service charges applicable to the premises . . . although payments may be accepted from tenants."].) The city has applied these ordinances in the manner surveyed in the opinion.

repealed.[6] An alternative writ issued. Stockton answered the petition, claiming the subject of its ordinances is a municipal affair and consequently, under article XI, section 5, the ordinances prevail over a conflicting statute.

The trial court found Stockton was not bound by section 10009.6 because it does not apply to charter cities. In the alternative, the trial court found the subject of billing for public utility services provided by a charter city is a municipal affair and that Stockton is not subject to statutory law on that subject.

Plaintiffs appeal from the ensuing judgment.

DISCUSSION

I

The threshold question is whether there is a conflict between section 10009.6 and the Stockton ordinances. (*California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1 [283 Cal.Rptr. 569, 812 P.2d 916]; *Johnson v. Bradley* (1992) 4 Cal.4th 389, 404 [14 Cal.Rptr.2d 470, 841 P.2d 990].)

A.

*The Term "Municipal Corporation" Includes Charter Cities*

The trial court found section 10009.6 does not apply to charter cities. It reached this conclusion because "when the [L]egislature wants to do something to a chartered city, they know how to if they want to. But they don't do that here with either of the Public Utilities Code sections involved."

The trial court relied upon statutes which explicitly exempt or include charter cities within their purview, e.g., Government Code sections 16281 and 65700. The reliance is misplaced; a statute need not use explicit

---

[6]By the same enactment section 10016 was amended to duplicate the provisions of section 10009.6 as regards the provision of water for residential use. Section 10016 was repealed by legislation effective January 1, 1999. (Stats. 1998, ch. 739, § 2.) Accordingly, we limit our discussion to section 10009.6.

language of reference to a charter city. The term "municipal corporation" will do as well.

■ The question is one of statutory construction, specifically, the meaning, i.e., the application, of the term "municipal corporation." "Municipal corporation" is a generic term generally including cities, which in turn includes charter cities. (See, e.g., 45 Cal.Jur.3d (1978) Municipalities, § 2, p. 20; *In re Pfahler* (1906) 150 Cal. 71, 81 [88 P. 270]; *Denman v. Broderick* (1896) 111 Cal. 96, 105 [43 P. 516]; Gov. Code, §§ 34100-34102.) It is used in that sense in article XI, section 9, which authorizes a "municipal corporation" to operate public works for the furnishing of utilities. (See, e.g., 45 Cal.Jur.3d, *supra*, § 129, pp. 208-209; *In re Orosi Public Utility Dist.* (1925) 196 Cal. 43, 55 [235 P. 1004].)

The only ambiguity is whether "municipal corporation" is *broader* than its application to charter cities. As early as 1867, the California Supreme Court stated that "municipal corporations" in the United States, unlike those in Great Britain, which depend upon prescription for their existence, "find every element of their jurisdiction within their respective charters." (*Herzo v. City of San Francisco* (1867) 33 Cal. 134, 145.) In 1891, it was felt necessary to state there might be municipal corporations *other* than cities and towns. (*In re Madera Irrigation District* (1891) 92 Cal. 296, 319 [28 P. 675].) Later courts recognized that in its strict sense, the term "municipal corporations" includes only incorporated cities and towns, but in its ordinary sense the term applies to all corporations exercising governmental functions on the local level. (*Division of Labor Law Enforcement v. El Camino Hosp. Dist.* (1970) 8 Cal.App.3d Supp. 30, 34 [87 Cal.Rptr. 476]; *Torres v. Board of Commissioners* (1979) 89 Cal.App.3d 545, 549-550 [152 Cal.Rptr. 506].)

■ As employed in division 5 of the Public Utilities Code, concerning utilities owned by municipal corporations, which includes section 10009.6, "municipal corporation" is used in its ordinary sense. The term includes "city." The Code Commission's comment to section 10001 states: "The term 'Municipal Corporation' is used in this Division where deemed appropriate, since it may have a broader meaning than 'city.'" (Code com. notes, 58 West's Ann. Pub. Util. Code (1994 ed.) foll. § 10001, p. 177, relying upon *State of California v. Marin Mun. W. Dist.* (1941) 17 Cal.2d 699, 702 [111 P.2d 651].)

The consideration that the Legislature sometimes expressly excludes charter cities from the operation of language that would otherwise include them,

e.g., Government Code section 65700, only shows that absent such an exclusion, as here, they are included. The fact the Legislature occasionally explicitly declares that a statute addresses a matter of statewide concern and shall apply to charter cities, e.g., Government Code section 16281, is also insufficient to require such a specification. In the ordinary case the Legislature makes no such declaration, but that does not obviate the need to determine whether the legislation addresses a matter of statewide concern. (See, e.g., *Baggett v. Gates* (1982) 32 Cal.3d 128, 136 [185 Cal.Rptr. 232, 649 P.2d 874].)

In sum, the term "municipal corporation" as used in section 10009.6 includes a city, including a charter city.

## B.

### *The Stockton Ordinances Conflict with Section 10009.6*

Section 10009.6 prohibits a municipal corporation which operates a public utility from recovering the overdue amounts which a tenant has contracted to pay from either a property owner or a subsequent tenant.[7]

The Stockton ordinances authorize the city to recoup a tenant's unpaid utility bills from the property owner. (See fn. 5, *ante*.) The ordinances, as applied by the city, impose joint liability upon a person or entity, the property owner, which is not a party to the tenant's contract, for the debt of a tenant.

The ordinances pertaining to "water, light, heat, power, sewage collection, treatment, or disposal for sanitary or drainage purposes" must give way to section 10009.6 (fn. 4, *ante*) unless the statute is unconstitutional as applied to Stockton. The trial court was incorrect in concluding that section 10009.6 does not apply to Stockton.

---

[7]We note that section 10009.6 is not anomalous: "The question of the kinds and nature of remedies available to cities and other local entities for the collection of charges imposed for utility services provided to citizens is one which has received substantial and explicit attention by the Legislature." (*Perez v. City of San Bruno* (1980) 27 Cal.3d 875, 886 [168 Cal.Rptr. 114, 616 P.2d 1287].)

## II

### *Section 10009.6 Is Within the Legislature's Plenary Authority Over Public Utilities Under Article XII*

Stockton claims section 10009.6 is unconstitutional as applied to its ordinances because they are municipal affairs within a charter city's constitutional authority to "make and enforce all ordinances and regulations in respect to municipal affairs . . . ." (Art. XI, § 5, subd. (a).)[8]

Article XI, section 5 derives from a 1914 amendment to the state Constitution. "In [that year], section 6 of article XI of the state Constitution was amended to provide that cities could amend existing charters and adopt new ones 'to make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in their several charters, and in respect to other matters they shall be subject to and controlled by general laws.' (See also Cal. Const., art. XI, § 8.) In 1922, the City of Stockton availed itself of this privilege. (Stats. 1923, p. 1321; Stockton City Charter, art. III, § 1.) Thus it has full power to regulate its municipal affairs and has complete control over such matters whether or not its charter expressly enumerates a power over the municipal affairs in question. (*Bellus* v. *City of Eureka* (1968) 69 Cal.2d 336, 346-347 [71 Cal.Rptr. 135, 444 P.2d 711].)" (*Lagrutta v. City Council* (1970) 9 Cal.App.3d 890, 894 [96 Cal.Rptr. 627].)

Stockton's premise is that the entire subject of municipal utilities is a municipal affair within article XI, section 5. It grounds the premise upon "the [c]onstitutional authority granted cities [under article XI, section 9], to operate . . . utility services."[9] The premise suffers two disabilities. First, the term "operate" does not extend to the regulation of services provided by a municipal utility. Second, article XI, section 9, does not extend to the lawful legislative regulation of municipal utilities as "public utilities" under article XII.

---

[8]Article XI, section 5 provides in relevant part that: "(a) It shall be competent in any city charter to provide that the city . . . may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws."

[9]Article XI, section 9 provides, in pertinent part, that: "[a] municipal corporation may establish, purchase, and operate public works to furnish its inhabitants with light, water, power, heat, transportation, or means of communication."

As we will show, Stockton's claim fails under article XII, because it had no vested right under its charter at the time of the passage of article XII to impose the kind of regulation in issue in this case.[10]

### A.

Article XI, section 9, derives from former article XI, section 19.[11] It was enacted by a legislative initiative on October 11, 1911, because "[t]here was some doubt whether municipal corporations could acquire and operate such enterprises . . . ." (*City of National City v. Fritz* (1949) 33 Cal.2d 635, 637 [204 P.2d 7].)

At the time of its passage only a chartered municipal corporation could operate a public utility and only if it was expressly authorized to do so by its charter. (*Matter of Russell* (1912) 163 Cal. 668 [126 P. 875]; see also *Oro Electric Corp. v. R. R. Commission* (1915) 169 Cal. 466 [147 P. 118].) Hence, the purpose of empowering a municipality to operate a public utility was to grant authority to a municipality to undertake that activity.

In the same session which proposed the initiative which became former article XI, section 19, the Legislature enacted statutes to carry out its provisions. They granted municipalities "the power to complete, reconstruct, extend, change, enlarge, and repair any . . . public utility acquired, constructed, owned or operated by a municipality." (Stats. 1911, ch. 715, § 1, p. 1394.) However, under this contemporaneous view of the scope of article XI, section 9, the grant of municipal authority did not preclude the Legislature from otherwise regulating municipal public utilities.

The state's legislative authority over public utilities is established in article XII. As with section 9 of article XI, article XII began as a legislative initiative which took effect October 11, 1911. (See art. XII, § 23, added by Stats. 1911, ch. 60, pp. 2164-2165.) It assigns broad authority to the Legislature to regulate public utilities. (See, e.g., *Los Angeles Cellular Telephone Co. v. Superior Court* (1998) 65 Cal.App.4th 1013, 1018, fn. 6 [76 Cal.Rptr.2d 894].) Two of the article XII provisions, sections 5 and 8, are material to this case.

Article XII, section 5, grants the Legislature plenary power to confer additional authority upon the commission over and above that directly

---

[10]For this reason we have no occasion to determine whether the subject matter of section 10009.6 is a municipal affair within the meaning of article XI.

[11]At the time of its passage article XI, section 19, provided in relevant part: "Any municipal corporation may establish and operate public works for supplying its inhabitants with light, water, power, heat, transportation, telephone service or other means of communication." (Stats. 1911, ch. 67, § 19, p. 2180.)

conferred by section 4.[12] It provides in pertinent part: "The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the [Public Utilities Commission (PUC)]."

Article XII, section 8, provides for the circumstances in which this power prevails over municipal affairs. It provides in pertinent part: "A city, county, or other public body may not regulate matters over which the Legislature grants regulatory power to the Commission. This section does not affect power over public utilities relating to the making *and* enforcement of police, sanitary, and other regulations concerning municipal affairs pursuant to a city charter existing on October 10, 1911 [unless revoked by the city's electors]." (Italics added.)

Article XII, sections 5 and 8 expressly authorize the Legislature to confer authority upon the PUC which is unlimited by other provisions of the constitution and which is superior to the charter powers of a city or county over municipal affairs, providing such powers were not within "a city charter existing on October 10, 1911 . . . ." (See, e.g., *City of San Mateo v. Railroad Com.* (1937) 9 Cal.2d 1 [68 P.2d 713].)[13] The express and plenary power of the Legislature to grant regulatory authority to the PUC implies that the Legislature possesses that power and also may regulate directly by statute. (See, e.g., *County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 166 [161 Cal.Rptr. 172, 604 P.2d 566] (hereafter *Inyo v. PUC*) [referring to the sections of the Public Utilities Code which now include § 10009.6].) That was the contemporary understanding of the Legislature, which enacted the legislative initiative in 1911 (which became article XII by vote of the people), as shown by the contemporaneous enactment in 1911 of

---

[12]Article XII, section 4, inter alia grants the Public Utilities Commission the authority to "fix rates and establish rules for the transportation of passengers and property by transportation companies . . . ."

[13]In *City of San Mateo v. Railroad Com.*, 9 Cal.2d at page 9, the Supreme Court reasoned as follows concerning conflict between municipal affairs powers and authority delegated under article XI, section 8: "San Mateo adopted a freeholders' charter in 1923, and Redwood City took similar action in 1929. Until their charters were adopted those cities were subject to and controlled by general laws. At the time of the adoption thereof those cities gathered unto themselves and became vested with the control of affairs municipal, but it does not follow that *thereby those cities were vested with such powers in 1911 when the constitutional proviso* [(art. XII, former § 23)] was adopted or in 1912 when the Public Utilities Act was passed. The city of San Carlos therefore has been and is subject to the provisions of section 43 of the Public Utilities Act as originally enacted and as amended in 1933. The cities of San Mateo and Redwood City were likewise subject to said section 43 as a general law until the adoption of their charters and are still subject thereto, including the amendment of 1933, if the subject *matter of the elimination of railroad grade crossings is germane to the subject of the* regulation of public utilities in this state."

the Public Utilities Act. (Stats. 1911, Ex. Sess. 1911, ch. 14, approved Dec. 23, 1911.) The act both delegates power to the Railroad Commission (the predecessor to the PUC) and enacts substantive legislation. It contains numerous substantive regulations of public utilities not delegated to the Railroad Commission. (See, e.g., § 22, which directed every common carrier to "afford all reasonable, proper and equal facilities for the prompt and efficient interchange and transfer of passengers . . . ." (Stats. 1911, Ex. Sess. 1911, ch. 14, § 22, p. 31.)

The resolution of a conflict between legislative regulation of a municipal public utility under article XII and municipal control under the municipal affairs doctrine is directed by the provision in article XII, section 5. It provides that the Legislature has "plenary power, unlimited by the other provisions of this constitution . . . to confer additional authority and jurisdiction upon the commission . . . ." This direction is reiterated in article XII, section 8: "[a] city, county, or other public body may not regulate matters over which the Legislature grants regulatory power to the Commission [except] pursuant to a city charter existing on October 10, 1911 . . . ." These directions make manifest that, with the exception noted, the specific regulatory power over public utilities granted under article XII supersedes a claim to the same power under the theory that it is a matter of municipal affairs. No other meaning can be ascribed to the language.

In *City of Pasadena v. Railroad Commission* (1920) 183 Cal. 526 [192 P. 25, 10 A.L.R. 1425], the Supreme Court opined that the Legislature was not authorized under the predecessor of article XII, section 5, former article XII, section 23,[14] to confer authority and jurisdiction on the Railroad Commission, the predecessor to the PUC, to regulate municipal utilities. The Supreme Court reasoned that because section 23 applied only to "private corporations" and individuals it "does not include municipal corporations among the public utilities it deals with."[15] (183 Cal. at p. 530.)

However, in *Inyo v. PUC, supra,* 26 Cal.3d 154, the Supreme Court disapproved this reasoning. "Article XII is not limited to common carriers

---

[14]Former article XII, section 23 was proposed by the Legislature as an initiative at the 1911 session of the Legislature. (Stats. 1911, ch. 60, § 23, pp. 2164-2165.)

[15]Former article XII, section 23, as adopted in October 1911, provided in pertinent part: "Every private corporation, and every individual or association of individuals, owning, operating [etc., a railroad or entity for the generation or transmission of light, water, power, etc. are] declared to be a public utility subject to such control and regulation by the railroad commission as may be provided by the legislature, and every class of private corporations, individuals, or associations of individuals hereafter declared by the legislature to be public utilities shall likewise be subject to such control and regulation." (Stats. 1911, ch. 60, § 23, pp. 2164-2165.)

and transportation companies, over which the commission has had jurisdiction since 1879, but deals with public utilities of all forms.[16] Thus possible legislation conferring PUC jurisdiction over municipally owned water companies, selling beyond municipal borders or even within such borders, would fall clearly within the scope of present article XII, section 5." (26 Cal.3d at p. 164, fn. omitted.)

Stockton suggests *Inyo v. PUC* is not binding on us as it is expressed in the course of a discussion of a situation not presented for decision, i.e., "possible legislation conferring PUC jurisdiction over municipally owned water companies. . . ." (*Inyo v. PUC, supra*, 26 Cal.3d at p. 164.)    ▓    However, "[t]o say that dicta are not controlling (supra, § 945) does not mean that they are to be ignored; on the contrary, dicta are often followed." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 947, p. 989.)[17]   ▓   For the reasons given concerning the text of article XII, sections 5 and 8, we find *Inyo v. PUC* persuasive and will follow it. We conclude that, except for the constraint that the exercise of legislative power under article XII must be consistent with that article, the power is plenary and unlimited by article XI.

### B.

The exception stems from article XII, sections 5 and 8. The plenary legislative authority over public utilities is limited; it must be "consistent with this article . . . ." (Art. XII, § 5.) As pertinent here, the criterion of consistency means the Legislature cannot impose a regulation upon a municipal utility in derogation of the authority over municipal affairs which was vested in a city by its charter at the time of the amendments to article XII on October 10, 1911. (Art. XII, § 8.)

Stockton submits that legislative control under section 10009.6 cannot extend to Stockton because that is an abridgment of "power over public utilities relating to the making and enforcement of police, sanitary, and other regulations concerning municipal affairs pursuant to a city charter existing

---

[16]At this point footnote 9 states: "*City of Pasadena's* assertion that a municipally owned utility is not a 'public utility' within the meaning of article XII (see 183 Cal. at pp. 530-532), although not expressly disapproved by *Los Angeles Met. Transit Authority v. Public Util. Com.* [(1963)] 59 Cal.2d 863 [31 Cal.Rptr. 463, 382 P.2d 583], is clearly inconsistent with the holding in the *Transit Authority* case sustaining PUC jurisdiction over a municipally owned common carrier." (*Inyo v. PUC, supra*, 26 Cal.3d p. 164, fn. 9.)

[17]The argument that *Inyo v. PUC* should be disregarded as dicta is somewhat ironic. As noted in *Los Angeles Met. Transit Authority v. Public Util. Com., supra*, 59 Cal.2d 863, 870, an earlier holding which also disapproves the reasoning in *City of Pasadena, City of Pasadena* is dicta with respect to legislative authority, since it did not involve a statute conferring jurisdiction on the PUC.

on October 10, 1911," within the meaning of article XII, section 8. Accordingly we asked for briefing on this question.

*Oro Electric Corp. v. R. R. Commission, supra,* 169 Cal. 466, examines the effect of the original enactment of this portion of what is now article XII, section 8. In that case the Railroad Commission had denied permission to Oro Electric Company (Oro) to furnish electricity in Stockton. (169 Cal. at p. 470.) Oro sought to overturn the denial on the ground Stockton had granted it a franchise, and the Railroad Commission denial ran afoul of the reservation of charter city power in the predecessor of article XII, section 8. (169 Cal. at p. 472.) The Supreme Court examined the version of Stockton's freeholders' charter existing on October 10, 1911, the "freeholders' charter, approved in 1889 (Stats. 1889, p. 577) and amended in 1905 (Stats. 1905, p. 832.)" (*Id.* at pp. 473-474.)

The opinion in *Oro Electric Corp. v. R. R. Commission, supra,* 169 Cal. at page 477, notes that the principle of construction of such a charter at the pertinent time was that: "language purporting to define the powers of a municipal corporation is to be strictly construed, and that any 'fair, reasonable doubt concerning the existence of the power is resolved by the courts against the corporation, and the power is denied.' (1 Dillon on Municipal Corporations, sec. 89.) This rule has been clearly announced by this court in various cases, of which it will suffice to cite *Von Schmidt* v. *Widber,* 105 Cal. 151, [38 Pac. 682], and *Hyatt* v. *Williams,* 148 Cal. 585, [84 Pac. 41]. . . . In both *Von Schmidt* v. *Widber* and *Hyatt* v. *Williams,* it was declared as a 'general and undisputed proposition of law,' quoting from 1 Dillon on Municipal Corporations, sec. 85m (5th ed., sec. 237), that 'a municipal corporation possesses and can exercise the following powers and no others: 1. Those granted in express words; 2. Those necessarily or fairly implied in or incident to the powers expressly granted; and 3. Those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable.' "

Under this view *Oro Electric Corp.* determined that Stockton did not have the power to grant franchises to electric corporations and the power delegated to the Railroad Commission to grant or deny such a franchise did not impair any power of control vested in the city. (169 Cal. at p. 483.)

The question in this case is whether Stockton's charter, as of October 10, 1911, provided authority to impose liability for a tenant's debt for public utility services on the landlord or subsequent tenant. Preliminary to that examination, Stockton argues that its charter as of that date must be

construed pursuant to the ordinary rules of statutory construction, citing *Diamond International Corp. v. Boas* (1979) 92 Cal.App.3d 1015, 1030 [155 Cal.Rptr. 616]. The case is inapposite; it rests upon the premise that a charter provision adopted under the 1914 amendments to the California Constitution is to be read as a limitation on municipal affairs powers, rather than a grant of power. (E.g., *West Coast Adver. Co. v. San Francisco* (1939) 14 Cal.2d 516, 521 [95 P.2d 138].)

However, the question here is what power was vested as a result of the charter in effect on October 10, 1911. That requires a construction of the charter as it would have been read at that time, i.e., whether, strictly construed, the charter *in effect on that date* confers a power to impose utility charges such as those in issue upon persons other than those who contracted for the utility services. (See *Oro Electric Corp. v. R. R. Commission, supra*, 169 Cal. at p. 477.)

Stockton would derive its authority from the provisions of the 1889 charter, in effect on October 10, 1911, which authorizes the city council "to fix and regulate the charges and fees of [officers of the city,] . . . and to compel the payment of all such charges and fees into the City Treasury," and to make rules and regulations necessary and proper for carrying into execution powers conferred by the charter.[18] We disagree.

The authority to bill and collect "charges and fees" for utility services does not extend to the imposition of an obligation on persons to whom those services were not provided. The authority to bill and collect fees is dependant upon and presupposes the existing law of contractual obligations, i.e., to bill and collect from those who are obligated to pay because they have contracted for the utility service. The power to create a civil obligation, by enacting a law imposing an obligation independent of contract (see Civ. Code, § 1428), is of a different order of authority. (See Civ. Code, § 1427, *City of Grangeville v. Haskin* (1989) 116 Idaho 535 [777 P.2d 1208].)

We conclude that Stockton had no vested right under its charter to exercise such a power at the time of the original enactment of article XII and it can derive no such power under article XII, section 8, by virtue of the plenary authority accorded the Legislature to control a public utility implied from article XII, section 5.

---

[18]Section 30, subdivision 33 of the 1889 charter grants the city council authority "[t]o make all needful rules to govern the official conduct and duties of all officers of the city whose duties are not defined by this charter, and to fix and regulate the charges and fees of all such officers where the fees are not otherwise fixed, and to compel the payment of all such charges and fees into the City Treasury." (Stats. 1889, ch. XI, p. 585.) The Stockton City Charter was amended in 1905 but did not amend the section at issue. (Cf. Stats. 1905, ch. VIII, p. 836.)

The trial court erred in denying the plaintiff relief from the application of Stockton's regulations insofar as they are in conflict with section 10009.6.

### DISPOSITION

The judgment is reversed. The trial court shall grant plaintiffs relief consistent with this opinion. The plaintiffs shall recover their costs of this appeal.

Scotland, P. J., and Morrison, J., concurred.

A petition for a rehearing was denied May 30, 2000, and respondents' petition for review by the Supreme Court was denied August 23, 2000.