[S. F. No. 20049.   In Bank.   Sept. 15, 1959.]

LOS ANGELES METROPOLITAN TRANSIT AUTHORITY, Petitioner, v. PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, Respondent.

Musick, Peeler & Garrett, Gerald G. Kelly and Jesse R. O'Malley for Petitioner.

Everett C. McKeage and William M. Bennett, Chief Counsel, Roderick B. Cassidy, Assistant Chief Counsel, and William C. Bricca, Senior Counsel, for Respondent.

Gordon, Knapp, Gill & Hibbert, Frank W. Doherty and Frank P. Doherty as Amici Curiae on behalf of Respondent.

TRAYNOR, J.—The Los Angeles Metropolitan Transit Authority (referred to hereafter as Authority) seeks the annulment of an order of the Public Utilities Commission granting a certificate of public convenience and necessity to Charter Bus Transportation Company (referred to hereafter as Charter).

Charter's operations include seasonal passenger stage services to the Santa Anita, Hollywood Park, and Los Alamitos racetracks, all of which are located in the vicinity of Los Angeles. On April 18, 1958, Charter applied to the commission for a certificate to engage in passenger stage service to and from the site of the home games of the Los Angeles Dodgers Baseball Club. Specifically, it requested authority

"to operate bus service during the baseball season between Los Angeles, Huntington Park, Lakewood, Bellflower, Downey, Culver City, Inglewood, La Crescenta, Montrose, Glendale, San Fernando, Torrance, Gardena, Compton, Lynwood, South Gate, Burbank, Beverly Hills, and Santa Monica, California and the Los Angeles Coliseum, Los Angeles, California (and any other place or places wherein said professional games may be played in the future), with pickups at certain hereinafter designated intermediate points.''

The proposed service would be confined to those wishing transportation to and from the baseball games. The routes the busses were to follow were shown at the hearing to overlap and parallel existing routes of the Authority and of protesting transit lines. Passenger pickups were to be made from specified stops along the various routes from the foregoing cities. Only round-trip service was to be provided. The proposed fares, ranging from $1.20 to $2.80, entitled the passengers to transportation to the ball grounds before the beginning of the game and to return transportation to the original point of pickup on the same bus at the end of the games to be played that day. The various protestants, particularly the Authority, conduct regularly scheduled operations throughout the area to be served by Charter, but none presently provide the proposed type of direct, round-trip service.

Protests were filed by the Authority, Tanner Motor Tours, Ltd., Santa Monica Municipal Bus Lines, Inglewood City Lines, Culver City Municipal Bus Lines, the city of Gardena, and the city of Torrance. Public hearings were held before a commission hearing officer on May 2, May 20, and June 4, 1958. On August 5, 1958, the commission filed its opinion and order authorizing the passenger stage operation requested by Charter except for minor modifications not here involved.

The Authority contends that the Los Angeles Metropolitan Transit Authority Act of 1957 (referred to hereafter as the 1957 Act) precludes the Public Utilities Commission from authorizing new passenger stage operations in Los Angeles County. The Public Utilities Commission contends that the 1957 Act does not preclude the commission from authorizing such operations.

If the commission retained jurisdiction to issue certificates of public convenience and necessity for passenger stage service in Los Angeles County after the enactment of the 1957 Act, the question whether the differences between the proposed

service and the existing service justified the issuance of a certificate of convenience and necessity would be a matter for the expert judgment and discretion of the commission and we would therefore affirm its order. (Pub. Util. Code, § 1757; *California Portland Cement Co.* v. *Public Util. Com.*, 49 Cal. 2d 171, 176 [315 P.2d 709]; *San Diego etc. Ferry Co.* v. *Railroad Com.*, 210 Cal. 504, 508-511 [292 P. 640].)

The crucial question in this case therefore is whether or not the 1957 Act precludes the commission from authorizing new passenger stage operations in Los Angeles County.

The original Los Angeles Metropolitan Transit Authority Act was enacted in 1951 to alleviate the transit problems of Los Angeles County. (Stats. 1951, ch. 1668, p. 3804.)[1] This legislation proved to be inadequate.

The 1957 Act gives the Authority greatly increased powers to establish an integrated mass rapid transit[2] system in Los Angeles County. The Authority may operate the system[3] itself,[4] may jointly[5] use facilities owned by itself or by existing transit systems, and may contract with existing corporations

---

[1]Rapid transit was defined by that act (§ 2.7) as: ". . . [T]ransportation of passengers, mail and hand baggage . . . by means of suspended overhead monorail on routes which the California Public Utilities Commission has first determined are required by public convenience and necessity, together with any supplemental feeder bus lines which established common carriers of passengers serving the area decline to provide after that commission has determined they are required by public convenience and necessity."

[2]Mass rapid transit, as defined in section 2.7 is ". . . [T]ransportation of passengers, mail and hand baggage by means of motor bus, trolley coach, street railway, rail, suspended overhead rail, elevated railway, subway, or any other surface, overhead or underground transportation or any combination thereof."

[3]"Section 2.8. 'System' means all real and personal property of every kind and nature whatsoever owned or held at any time by the authority for mass rapid transit. . . ."

[4]"Section 4.8. . . . The authority may operate motor bus lines, and motor busses upon any public streets, highways, ways or freeways, and, subject to the requirements of the last preceding sentence with respect to new structures, may operate any other method of mass rapid transit in, upon, over, under or across public streets, highways, freeways and other public places."

[5]"Section 4.5. The authority shall have power to enter into agreements for the joint use of any property and rights by the authority and any public utility operating any transportation facilities; to enter into agreements with any public utility operating any transportation facilities either within or without the metropolitan area for the joint use of any property of the authority or public utility, or the establishment of through routes, joint fares and transfer of passengers."

for the superintendence[6] of the Authority's system. It is given broad powers to acquire and dispose of property.[7] When its economic engineering studies show that it would not be feasible for it to operate transit facilities in a particular area, it may propose and support a special tax-supported transit district in that area.[8]

---

[6] ''Section 3.6 (b). The authority may to the extent permitted by the Constitution of the State of California, make a contract for superintendence with any corporation (sometimes in this act referred to as the superintending corporation) which has executive personnel with experience and skill applicable to the superintendence of the operation and maintenance of any part of the system for the furnishing of its services and the services of experienced and qualified personnel for the superintendence of the operation and maintenance of the system or any part thereof. . . . Neither such contract, nor the corporation which is a party thereto with respect to its rights and duties thereunder, shall be subject to control or regulation by the Public Utilities Commission or by any political subdivision of the State of California other than by the authority as provided in such contract.''

[7] ''Section 4.3. The authority may acquire by grant, purchase, gift, devise or lease, and may hold, use, sell, lease or dispose of real and personal property of every kind and nature whatsoever, licenses, patents, rights and interests necessary for the full exercise, or convenient or useful for the carrying on of, any of its powers pursuant to the provisions of this act.

''Section 4.4. The authority shall have power to acquire, construct, complete, develop, own, operate and maintain the system; including power to acquire by purchase, lease, gift or otherwise all or any part of any patents, licenses, rights, interests, engineering studies, data or reports owned or held by any person and determined by the authority to be necessary, convenient or useful to the authority in connection with the acquisition, construction, completion, development, ownership, operation or maintenance of the system.

''Section 4.6. The authority may exercise the right of eminent domain for the condemnation of real or personal property or any right or interest therein for its use within the metropolitan area, including the power to acquire real property in fee simple or any lesser estate or interest for rights of way or other uses of the authority. . . . Sections 1401 to 1421, inclusive, of the Public Utilities Code shall not apply to any such condemnation of property of a privately owned public utility with the consent of such public utility at a price agreed to between the authority and such public utility, and the Public Utilities Commission of the State of California shall have no jurisdiction with respect thereto. . . .''

[8] ''Sec. 6.12. The governing body of any public corporation within the metropolitan area may petition the authority by resolution for an extension of mass rapid transit service, and the authority shall provide for a public hearing to consider such petition.

''Upon conclusion of the public hearing, the authority shall make economic engineering studies concerning such extension of mass rapid transit services; and if such extension is shown to be economically feasible, the authority shall proceed to engineer, finance, construct, and operate such mass rapid transit services.''

''Sec. 11.2. In the event economic engineering studies of the authority show public transit needs to exist in specific areas but that studies of feasibility do not show sufficient income to support the required financing

The 1951 Act gave the Authority some of the foregoing powers, but expressly provided that it could exercise its powers only under the regulatory control of the Public Utilities Commission.[9] The Authority's routes[10] and rates,[11] and contracts[12] were also subject to control by the Public Utilities Commission. ▮ Under the 1957 Act the commission has no control over the Authority with respect to any of these matters. ▮ In the absence of legislation otherwise providing, the commission's jurisdiction to regulate public utilities extends only to the regulation of privately owned utilities. (*San Bernardino* v. *Railroad Com.*, 190 Cal. 562 [213 P. 980]; *Civic Center Assn.* v. *Railroad Com.*, 175 Cal. 441, 445 [166 P. 351]; *Colman* v. *Montebello*, 24 C.R.C. 930, 931.)

The legislative policy that prompted the adoption of the

by revenue bonds, then the authority in cooperation with public agencies within said area shall determine the boundaries of a transit district within the Los Angeles metropolitan area which requires such services and, through duly constituted powers of local agencies propose and support the creation of said transit district with powers provided by voters for the taxation of property and the financing of said district through general obligation bonds adequate to engineer, construct and operate such required system of transit. The said district may operate such facilities independently for the benefit of the people or, by contract or otherwise, may enter into agreement with the Los Angeles Metropolitan Transit Authority for coordinated operation of such facilities and the authority shall thereupon integrate the operations of such system with all its other transit operations to develop public transit services for the benefit of the people of the metropolitan area.''

[9] ''The Legislature, in placing the authority under the jurisdiction of the Public Utilities Commission . . . has made exceptions to a long established policy because of the unique character of the authority and the particular circumstances and conditions requiring its creation. It is not the intent of the Legislature that these exceptions be deemed, in any way, a precedent with respect to any other public corporation.'' (Stats. 1951, ch. 1668, § 13.4.)

[10] '' 'Rapid transit' means transportation . . . by means of suspended overhead monorail on routes which the California Public Utilities Commission has first determined are required by public convenience and necessity, together with any supplemental feeder bus lines which established common carriers of passengers serving the area decline to provide after that commission has determined they are required by public convenience and necessity.'' (Stats. 1951, ch. 1668, § 2.7.)

[11] ''Subject to the jurisdiction of the Public Utilities Commission, the authority may fix rates, fares, tolls, charges, rents or other charges. . . .'' (Stats. 1951, ch. 1668, § 4.9.)

[12] ''Subject to the provisions of the Public Utilities Act and authorization pursuant thereto from the Public Utilities Commission, the authority may make contracts, leases and agreements with any person or public corporation. . . .'' (Stats. 1951, ch. 1668, § 4.12.)

1957 Act is stated in section 1.1 as follows: "It is hereby declared to be the policy of the State of California to develop mass rapid transit systems in the various metropolitan areas within the State for the benefit of the people. A necessity exists within Los Angeles County . . . for such a system. Because of the numerous separate municipal corporations and unincorporated populated areas in the . . . [County], *only* a specially created authority can operate effectively in said metropolitan area. Because of the unique problem presented by that metropolitan area and the facts and circumstances relative to the establishment of a mass rapid transit system therein, the adoption of a special act and the creation of a *special* authority is required." (Italics added.)

The Authority contends that this declaration of policy and the plenary powers granted to it to establish an integrated transit system constitute a legislative determination binding on the commission that "public convenience and necessity" in Los Angeles County do not require additional privately-operated public transit services.

Section 1031 of the Public Utilities Code provides that "No passenger stage corporation shall operate or cause to be operated any passenger stage over any public highway in this State without first having obtained from the commission a certificate declaring that public convenience and necessity require such operation. . . ." ▮ Unlike its limitations on certain of the commission's other powers,[13] the 1957 Act

---

[13]Section 3.6(b) (The Authority may enter into contracts for superintendence of the system): "... Neither such contract, nor the corporation which is a party thereto with respect to its rights and duties thereunder, shall be subject to control or regulation by the Public Utilities Commission. . . ."

Section 4.6 (The Authority may condemn privately owned passenger stage operations): "... Sections 1401 to 1421, inclusive, of the Public Utilities Code shall not apply to any such condemnation of property of a privately owned public utility with the consent of such public utility at a price agreed to between the authority and such public utility, and the Public Utilities Commission of the State of California shall have no jurisdiction with respect thereto. . . ."

Section 4.21 (The Authority must purchase certain existing privately owned systems): "Section 851 of the Public Utilities Code shall not apply to any contract for sale or sale of an existing system or portion thereof or other action taken pursuant to this section, and the Public Utilities Commission of the State of California shall have no jurisdiction with respect thereto."

Section 6.10 (The Authority may purchase other privately owned systems): "... Section 851 of the Public Utilities Code shall not apply to such contract, or to any sale of assets or other action taken pursuant to such contract, and the Public Utilities Commission of the State of California shall have no jurisdiction with respect thereto."

does not expressly curtail the commission's power to grant new certificates of public convenience and necessity in Los Angeles County, nor does it expressly provide that public convenience and necessity do not require additional privately-operated public transit services in that area. Moreover, we have concluded that such provisions may not be implied from the powers granted to the Authority, the declaration of policy, or both.

■ In creating the Authority, the 1957 Act necessarily looked to the future, and by stating that "only a specially created authority can operate effectively in said metropolitan area," it clearly contemplates that ultimately there shall be a single integrated system of public transportation in Los Angeles County, operated by the Authority. The 1957 Act recognizes and protects existing publicly-owned and privately-owned transit systems, however (§ 4.21), and provides that such systems cannot be condemned by the Authority without the consent of their owners. (§ 4.6.) One of the purposes of the 1957 Act "is to coordinate any operations of the authority with the operations of any then existing system...." (§ 4.21.) ■ Thus, despite its ultimate goal, the 1957 Act contemplates that for some time independent publicly-owned and privately-owned transit systems and the Authority shall all provide transit service in Los Angeles County. If the public is to be adequately served, such service must grow to meet the needs of the county's ever increasing population. The 1957 Act does not expressly provide that such additional service must be undertaken by the Authority, and it recognizes that there may be extensions of privately-owned transit systems. Thus, section 4.21, which extends an option to private companies to compel their condemnation by the Authority in the event the Authority establishes a new competitive service, expressly excludes "any subsequent extension or rerouting" of the existing privately-owned system. ■ Moreover, even if the 1957 Act were completely silent with respect to extensions of privately-owned systems, unless it clearly appeared that the machinery provided by that act was adequate to meet the public need and that new privately-operated service would defeat the ultimate objective of a single integrated system, we could not reasonably imply an abridgment of the commission's power to grant certificates of convenience and necessity to serve the public interest.

The Authority points out that it is empowered to initiate

new service and that on petition of any public corporation within the metropolitan area it "shall proceed to engineer, finance, construct, and operate" an extension of transit service if, after a public hearing and appropriate studies, the extension is shown to be economically feasible (§ 6.12), and that if a needed extension cannot be financed by revenue bonds, the Authority shall propose and support a special tax-supported district in the area involved. (§ 11.2.) It contends, therefore, that the 1957 Act sets up adequate machinery to provide for any additional services necessary and that to permit the creation or expansion of privately-operated transit service will necessarily obstruct, if not defeat, the attainment of a single integrated system.

There are many areas of the county, however, that the Authority does not now serve, and even in the areas it does serve, it neither provides nor intends to provide the type of service the commission found necessary and convenient in this case. The Authority's present system was formed on March 3, 1958, by uniting the Los Angeles Transit Lines and the Metropolitan Coach Lines, the two major transit companies in Los Angeles County. In addition to the Authority there are now four publicly-owned transit companies and 36 privately-owned companies operating in Los Angeles County. The services provided by these companies must be permitted to grow until such time as the Authority is in a position to integrate them into its system, or the public interest in adequate transportation will suffer. Thus, a new subdivision may be opened in a community served by a private transit company in an area remote from the Authority's existing lines. It may not be economically feasible for the Authority to serve the new area but wholly feasible for the private company to do so, and under these circumstances the electorate may be reluctant to approve a tax-supported district to provide service that could economically be undertaken by the existing private company. Community growth does not respect county lines. Adjacent population centers served by outside private companies may lap over into the county calling for new transit lines, some of which might lie wholly within the county. Such lines might be feasible as part of the private service but not as part of the Authority's service. It is true that the Authority may cooperate with outside companies and provide for integrated service across county lines, but in any given case it may be some time before the

Authority's system has expanded to make it feasible for it to do so. Different types of services within the same area present similar problems. In the present case, Charter already operates service to various race tracks similar to the service it seeks to provide to the baseball games. Given a system set up to provide this type of specialized service, it may be economically feasible for Charter to expand that service, whereas it might not be economically feasible for the Authority, which provides primarily nonspecialized service, partially to enter the specialized field and it may be some time before it is in a position to integrate sufficient specialized service into its system to justify the undertaking. In short, given the existing pattern of publicly-owned and privately-owned transportation systems and the constant growth of the county, it is clear that there are many necessary new services that privately-owned systems can provide now but which the Authority will be able to provide only at some time in the future.

To permit the certification of new privately-operated public transit need not interfere with the ultimate achievement of a single integrated system operated by the Authority. It must be assumed that the commission will give heed to that legislative objective and not authorize privately-owned carriers to provide services that the Authority is willing and able to provide and that the commission will not thereby impede the growth of the Authority's system. Authorization of service that the Authority is not presently willing or able to provide, however, will not impede its growth but tend instead to insure that when it is able to integrate the privately-operated service into its own, it will add, not a unit that has been compelled to stagnate since 1957, but one that has kept pace with growing demands for service.

The order is affirmed.

Gibson, C. J., Schauer, J., Spence, J., McComb, J., Peters, J., and White, J., concurred.