[No. H026101. Sixth Dist. Nov. 22, 2004.]

SANTA CLARA VALLEY TRANSPORTATION AUTHORITY, Petitioner,
v.
PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA,
Respondent.

## COUNSEL

Suzanne B. Gifford, Richard A. Katzman and Benjamin H. Scharf for Petitioner.

California Transit Association as Amicus Curiae on behalf of Petitioner.

Lionel B. Wilson, Jr., Randy Wu, Mary F. McKenzie and Dale Alison Holzschuh for Respondent.

## OPINION

**BAMATTRE-MANOUKIAN, Acting P. J.**—This case concerns the scope of the Public Utilities Commission's jurisdiction over light rail transit systems operated by a transit district. The Santa Clara Valley Transportation Authority (VTA), a regional transit district, timely sought a writ of review of two decisions of the Public Utilities Commission (PUC) in which the PUC

concluded that it had independent authority to review the transit district's light rail crossings, pursuant to Public Utilities Code section 99152, which concerns the safety of public transit guideways, and pursuant to Public Utilities Code sections 1201 and 1202, which are more broadly worded grants of power to the PUC over railroad crossings in general.[1] The transit district agreed that the PUC has safety oversight jurisdiction over light rail transit systems, including crossings, under section 99152, but the transit district asserted that the PUC's exclusive jurisdiction over railroad crossings under sections 1201 and 1202 did not apply to the transit district. We issued a writ of review to decide the limited issue of whether the exclusive railroad crossing jurisdiction conferred on the PUC by the Legislature pursuant to sections 1201 and 1202 also applies to the VTA's light rail transit crossings. We conclude that sections 1201 and 1202 do not apply to the transit district, and we therefore annul the PUC decisions to the extent the PUC asserted jurisdiction over the transit district's light rail crossings pursuant to these sections.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The Santa Clara County Transit District, now known as VTA, is a transit district formed pursuant to the Santa Clara County Transit District Act in 1969. (§ 100000 et seq.)[2] The VTA is one of several public transportation operators that currently operate light rail transit systems in California.

In January 2001, the VTA filed an application with the PUC for authorization to construct an at-grade crossing of Hamilton Avenue by the light rail transit line of its Vasona Light Rail Project in the City of Campbell. (PUC Application No. 01-01-003.) The PUC's rail staff "protested" the application based on safety concerns regarding an at-grade crossing and asserted that a grade-separated crossing was the only safe method of crossing.[3] After further study, the VTA decided to construct an aerial grade-separated crossing of the road and filed a petition to withdraw the application. In its petition to withdraw the application, the VTA took the position that the PUC's authorization to construct the Hamilton Avenue crossing was not required since the VTA had decided to cross Hamilton Avenue by an aerial grade separation and had abandoned its earlier plan to cross at grade. The PUC decision denying the VTA's petition to withdraw the application and the related PUC decision denying rehearing are the subject of this court's review.

---

[1] Further statutory references are to the Public Utilities Code unless otherwise specified.

[2] The name of the Santa Clara County Transit District was changed to the Santa Clara Valley Transportation Authority in 1999. (§ 100002.)

[3] An "at-grade" crossing is one that physically crosses the road at street level. A "grade-separated" crossing physically separates the train from traffic by utilizing an overpass or underpass.

In its decision, the PUC found that it had jurisdiction to approve the construction and placement of the VTA's light rail crossings. (PUC Dec. No. 02-12-053 (Dec. 17, 2002) (hereafter Decision).) The PUC also discussed the scope of its jurisdiction to review and approve rail/street crossings. As noted in the Decision, the VTA admitted that it was subject to PUC jurisdiction under sections 100168, 778, and 99152. (Decision, at p. 14.) The PUC found that it had broad safety authority under section 99152 and that this "safety jurisdiction" extended over transit system guideways, including inspection and approval of rail/street crossings.[4] The PUC also found that its exclusive "rail crossing jurisdiction," conferred by section 1202, applied to street railroads operated by transit districts, including the VTA. As stated in the Decision, "Since a plain reading of § 1202 makes it clear that the Commission has exclusive jurisdiction over street crossings by street railroads like those operated by VTA, the Commission is required to review and approve the proposed Hamilton Avenue crossing before that crossing can be constructed. That jurisdictional imperative, both as to § 1201 and § 1202, derives from the Constitution and has been broadly interpreted to apply in the case of public agencies. We conclude that VTA is subject to the rail crossing authority of this Commission."[5] (Decision, at p. 23.)

---

[4] As part of the VTA's enabling legislation, section 100168 provides: "The district shall be subject to the regulations of the Public Utilities Commission relating to safety appliances and procedures, and the commission shall inspect all work done pursuant to this part and may make such further additions or changes necessary for the purpose of safety to employees and the general public. The commission shall enforce the provisions of this section."

Section 99152 applies to all public transit districts and provides: "Any public transit guideway planned, acquired, or constructed, on or after January 1, 1979, is subject to regulations of the Public Utilities Commission relating to safety appliances and procedures. [¶] The commission shall inspect all work done on those guideways and may make further additions or changes necessary for the purpose of safety to employees and the general public. [¶] The commission shall develop an oversight program employing safety planning criteria, guidelines, safety standards, and safety procedures to be met by operators in the design, construction, and operation of those guideways. Existing industry standards shall be used where applicable. [¶] The commission shall enforce the provisions of this section."

Section 778 provides: "The commission shall adopt rules and regulations, which shall become effective on July 1, 1977, relating to safety appliances and procedures for rail transit services operated at grade and in vehicular traffic. The rules and regulations shall include, but not be limited to, provisions on grade crossing protection devices, headways, and maximum operating speeds with respect to the speed and volume of vehicular traffic within which the transit service is operated. [¶] The commission shall submit the proposed rules and regulations to the Legislature not later than April 1, 1977."

[5] Section 1202 provides in relevant part: "The commission has the exclusive power: [¶] (a) To determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use, and protection of each crossing of one railroad by another railroad or street railroad, and of a street railroad by a railroad, and of each crossing of a public or publicly used road or highway by a railroad or street railroad, and of a street by a railroad or of a railroad by a street. [¶] (b) To alter, relocate, or abolish by physical closing any crossing set forth in subdivision (a). [¶] (c) To require, where in its judgment it would be practicable, a separation of grades at any crossing established and to prescribe the

The VTA filed an application for rehearing of the Decision, claiming that those portions of the Decision that asserted jurisdiction over the VTA regarding the placement and construction of its light rail transit street crossings under sections 1201 and 1202 were in excess of the PUC's jurisdiction. In May 2003, the PUC denied the application for rehearing. (PUC Dec. No. 03-05-081 (May 22, 2003) (hereafter Rehearing Decision).) In its Rehearing Decision, the PUC emphasized that it had adequate authority to review the VTA's crossings pursuant to either section 99152, concerning the safety of public transit guideways, or pursuant to sections 1201 and 1202, concerning railroad crossings. The PUC concluded that its authority pursuant to either statutory scheme was sufficient to support its conclusion that it had the authority to require the VTA to file an application for approval prior to the construction of the VTA's light rail crossings. The PUC also found that it independently had authority over the VTA's light rail crossings pursuant to sections 1201 and 1202.

The VTA filed a petition for writ of review, challenging only the PUC's assertion of exclusive jurisdiction under sections 1201 and 1202. We issued a writ of review to resolve this limited jurisdictional issue.

## II.  SCOPE OF REVIEW

This court's authority to issue a writ of review and the scope of such review is set forth in section 1756 et seq. Section 1756, subdivision (a) provides in relevant part: "Within 30 days after the commission issues its decision denying the application for a rehearing, . . . any aggrieved party may

---

terms upon which the separation shall be made and the proportions in which the expense of the construction, alteration, relocation, or abolition of crossings or the separation of grades shall be divided between the railroad or street railroad corporations affected or between these corporations and the state, county, city, or other political subdivision affected."

Section 1201 provides: "No public road, highway, or street shall be constructed across the track of any railroad corporation at grade, nor shall the track of any railroad corporation be constructed across a public road, highway, or street at grade, nor shall the track of any railroad corporation be constructed across the track of any other railroad or street railroad corporation at grade, nor shall the track of a street railroad corporation be constructed across the track of a railroad corporation at grade, without having first secured the permission of the commission. This section shall not apply to the replacement of lawfully existing tracks. The commission may refuse its permission or grant it upon such terms and conditions as it prescribes."

A separate legislative declaration set forth in section 1219 provides: "The Legislature declares that Sections 1201 to 1205, inclusive, are enacted as germane and cognate parts of and as aids to the jurisdiction vested in the commission for the supervision, regulation, and control of railroad and street railroad corporations in this State, and the Legislature further declares that the authority and jurisdiction thus vested in the commission involve matters of state-wide importance and concern and have been enacted in aid of the health, safety, and welfare of the people of this State."

petition for a writ of review in the court of appeal or the Supreme Court for the purpose of having the lawfulness of the original order or decision or of the order or decision on rehearing inquired into and determined. If the writ issues, it shall be made returnable at a time and place specified by court order and shall direct the commission to certify its record in the case to the court within the time specified." The scope of judicial review includes determining, inter alia, whether the commission acted without, or in excess of, its powers or jurisdiction, whether the commission has not proceeded in the manner required by law, or whether the order or decision was an abuse of discretion. (§ 1757, subd. (a)(1), (2) & (5).)

Here, petitioner VTA timely filed a petition for a writ of review after denial of rehearing, challenging the scope of the PUC's assertion of exclusive jurisdiction below. As set forth in the PUC Decision and Rehearing Decision, the PUC repeatedly asserted that it independently has authority over light rail crossings pursuant to sections 1201 and 1202, that it has exclusive rail crossing jurisdiction under section 1202, and that the VTA is subject to its section 1201 and section 1202 jurisdiction since it operates a "street railroad."

Since the PUC has repeatedly asserted that it possesses jurisdiction over the VTA under sections 1201 and 1202, the instant matter is the proper subject of a writ of review by this court. There is a legitimate question whether the PUC is acting outside the scope of its jurisdiction by asserting continuing jurisdiction under sections 1201 and 1202, notwithstanding the fact that the PUC admittedly has safety jurisdiction over light rail crossings under sections 99152, 778, and 100168.

The PUC maintains that the issue in this case is whether it has the authority to require the VTA to file an application and obtain the PUC's approval prior to constructing its light rail crossings. The PUC asserts that two separate legislative grants provide it with authority to review the placement and construction of light rail transit crossings and that either statutory scheme, i.e., section 99152 safety jurisdiction and section 1202 exclusive railroad crossing jurisdiction, provide it with independent sources of authority to review the VTA's crossings.

We wish to emphasize that the issue we decide is limited to the question of whether the exclusive railroad crossing jurisdiction conferred on the PUC by the Legislature pursuant to sections 1201 and 1202 also applies to the VTA's light rail transit crossings. We do not reach the separate issue of whether the PUC has the authority to require the VTA to file an application and obtain the PUC's approval of its light rail transit crossings pursuant to the PUC's section 99152 safety jurisdiction and the existing General Order 143-B application requirement since the VTA has conceded this issue and did not

contest this aspect of the Decision in its rehearing application.[6] (See § 1732.) Here, the PUC maintains that sections 1201 and 1202 provide it with an independent statutory source of jurisdiction over the VTA's light rail transit crossings. Hence, we address only the issue of the PUC's assertion of jurisdiction under sections 1201 and 1202.

## III. DISCUSSION

### A. *Mootness*

Prior to oral argument, we requested that the parties be prepared to discuss whether the case should be considered moot in light of the fact that the PUC subsequently approved the VTA's application for an aerial crossing of Hamilton Avenue, which was filed after the PUC Decision in this case. At oral argument, both the PUC and VTA acknowledged that a continuing jurisdictional dispute remained and noted the importance of having this court decide this issue.

After further consideration, we find that the matter is not moot and that this controversy is ripe for our review. The VTA's subsequent application for an aerial crossing was made pursuant to sections 99152 and 100168 and General Orders 164-B and 143-B, and it expressly reserved the legal jurisdictional issues in the PUC Decision for later determination by the PUC or the courts. (PUC Application No. 02-12-040.) The subsequent application notwithstanding, the PUC issued its final Rehearing Decision in this case, reaching the section 1201 and section 1202 jurisdictional dispute, continuing to assert such jurisdiction, and triggering the VTA's right to petition this court for review. In light of the PUC's continuing assertion of section 1201 and section 1202 jurisdiction over the Hamilton Avenue crossing, we find that a material controversy remains for our determination and that the matter is not moot. (See *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 [63 Cal.Rptr. 21, 432 P.2d 717].)

Furthermore, even if we were to find the matter technically moot as to the Hamilton Avenue crossing, we would exercise our discretion to resolve this jurisdictional dispute since it is a matter of continuing public importance and the issue is likely to recur with respect to future light rail transit crossings constructed by the VTA and other public entities that operate light rail transit

---

[6] General Order 143-B and its application requirement were expressly established by the PUC to implement its light rail transit safety jurisdiction. Section 1.02 of General Order 143-B expressly provides: "These rules and regulations are authorized by and implement the provisions of Sections 778, 29047, 30646, 99152, and 100168 of the Public Utilities Code." Hence, the General Order 143-B application requirement was not implemented pursuant to the PUC's section 1202 exclusive railroad crossing jurisdiction.

systems throughout the state. (See *Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 746–747 [29 Cal.Rptr.2d 804, 872 P.2d 143].)

B. *Legal Background*

■ " ' "The [PUC] is a state agency of constitutional origin with far-reaching duties, functions and powers. (Cal. Const., art. XII, §§ 1–6.) The Constitution confers broad authority on the [PUC] to regulate utilities, including the power to fix rates, establish rules, hold various types of hearings, award reparation, and establish its own procedures. (*Id.*, §§ 2, 4, 6.)" ' [Citation.] In addition to those powers expressly conferred on the PUC, the California Constitution confers broad authority on the Legislature to regulate public utilities and to delegate regulatory functions to the PUC. (Cal. Const., art. XII, §§ 3, 5.)" (*Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256, 264–265 [115 Cal.Rptr.2d 874, 38 P.3d 1098].)[7]

■ As our Supreme Court has recognized, "[e]stablished doctrine declares that, 'In the absence of legislation otherwise providing, the [PUC's] jurisdiction to regulate public utilities extends only to the regulation of privately owned utilities.' (*Los Angeles Met. Transit Authority v. Public Utilities Com.* (1959) 52 Cal.2d 655, 661 [343 P.2d 913].) The Court of Appeal noted the same principle in *People* ex rel. *Pub. Util. Com. v. City of Fresno* [(1967)] 254 Cal.App.2d 76, 81 [62 Cal.Rptr. 79]. We reiterated in *Orange County Air Pollution Control Dist. v. Public Util. Com.* (1971) 4 Cal.3d 945, 953 at footnote 7 [95 Cal.Rptr. 17, 484 P.2d 1361], that 'The [PUC] has no jurisdiction over municipally owned utilities unless expressly provided by statute.' Significantly, when the Legislature first granted the PUC regulatory authority over the Los Angeles Metropolitan Transit Authority, it enacted such a specific statute (Stats. 1951, ch. 1668, p. 3804), and observed that in so doing it 'has made exceptions to a long established policy. . . .' (Stats. 1951, ch. 1668, § 13.4.)" (*County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 166 [161 Cal.Rptr. 172, 604 P.2d 566].)

---

[7] Article XII, section 3 of the California Constitution provides: "Private corporations and persons that own, operate, control, or manage a line, plant, or system for the transportation of people or property, the transmission of telephone and telegraph messages, or the production, generation, transmission, or furnishing of heat, light, water, power, storage, or wharfage directly or indirectly to or for the public, and common carriers, are public utilities subject to control by the Legislature. The Legislature may prescribe that additional classes of private corporations or other persons are public utilities."

Article XII, section 5 of the California Constitution provides: "The Legislature has plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission, to establish the manner and scope of review of commission action in a court of record, and to enable it to fix just compensation for utility property taken by eminent domain."

■ The VTA, like all transit districts in the state, is a public district organized pursuant to state law and designated as a transit district in its enabling legislation. (See §§ 99213, 100001.) Pursuant to its enabling legislation, the Legislature has granted the VTA a broad range of powers in order to meet the public transit and transportation problems of Santa Clara County. (§§ 100001, 100001.5.) The VTA is statutorily authorized to "exercise any and all powers granted by any other law that, by its terms, is applicable to transit districts generally, to public agencies generally, or to any classification of districts or public agencies that includes a district of the type provided for in this part, but the district shall not exercise any power contrary to an express provision of this part." (§ 100115.) The VTA's enabling legislation also grants the VTA broad authority over the design, location, and construction of its light rail transit system. (See §§ 100161, subd. (a), 100164.)

■ Here, the fundamental issue concerns the scope of the PUC's jurisdiction under sections 1201 and 1202, which generally grant the PUC exclusive jurisdiction over railroad and street railroad crossings. The California Constitution authorizes the Legislature to grant jurisdiction to the PUC, and the Legislature has conferred section 1201 and section 1202 jurisdiction on the PUC; however, the Legislature also enacted the VTA's enabling legislation and granted the VTA extensive powers as a transit district. Since the VTA is in essence a creature of statute and given the statutory basis of the disputed jurisdiction, resolution of this case turns on the issue of statutory interpretation and legislative intent. The important question in this case is whether the Legislature intended for sections 1201 and 1202 to apply to the transit district. We believe that the resolution of this issue requires an understanding of the context in which the Legislature created the section 1201 and 1202 jurisdiction, the VTA, and related statutes.

The relevant provisions of sections 1201 and 1202 and the associated declaration of legislative intent found in section 1219 predate the creation of the VTA. The PUC's exclusive railroad crossing jurisdiction pursuant to section 1202 actually predates the creation of transit districts and was included in the original act creating the Public Utilities Code in 1951. (Stats. 1951, ch. 764, §§ 1201–1202, pp. 2071–2072.) In fact, the historical origin of the PUC's section 1202 exclusive railroad crossing jurisdiction can be traced back much further. (See, e.g., Stats. 1911, ch. 20, § 15, p. 18 [predecessor of § 1202, subds. (a)–(c)]; Stats. 1911, Ex. Sess., ch. 14, § 43(a), p. 40 [predecessor of § 1201]; Stats. 1933, ch. 855, § 1, p. 2234 [predecessor of § 1219].)

In 1955, the Legislature added division 10 to the Public Utilities Code, which contains the enabling legislation for the individual transit districts. (Stats. 1955, ch. 1036, § 2, p. 1950.) Over time, the Legislature has passed enabling legislation for the individual transit districts.

In 1969, the Legislature passed the enabling legislation for the VTA, which is a separate statutory scheme contained in a separate part of the Public Utilities Code, i.e., part 12 of division 10. (§ 100000 et seq.) The Legislature expressly found and declared that it was "necessary that a transit district be established in the County of Santa Clara in order to meet the public transit problems of that county" and that the "formation of a special district [was] required." (§ 100001.)[8]

When the Legislature passed the VTA's enabling legislation, it included an express provision subjecting the VTA to PUC regulation "relating to safety appliances and procedures." (§ 100168.) However, the VTA's enabling legislation did not and does not contain any provision similar to section 1202 that would expressly provide the PUC with exclusive jurisdiction over the VTA's light rail crossings.

In 1976, several years after the creation of the VTA, the Legislature added section 778, which required the PUC to adopt rules and regulations relating to safety appliances and procedures for rail transit services operated at grade and in vehicular traffic. (Stats. 1976, ch. 924, § 1, p. 2110.)

In 1978, the Legislature added section 99152, which subjected any new public transit guideways to the PUC's regulation of "safety appliances and procedures." (Stats. 1978, ch. 1142, § 1, p. 3509.) As noted in the Legislative Counsel's Digest, "[u]nder existing law, the San Francisco Bay Area Rapid Transit District, the [VTA], and the Southern California Rapid Transit District are subject to the regulations of the [PUC] relating to safety appliances and procedures and inspection by the [PUC] related thereto," and the new law would subject any new public transit guideways to such regulations and inspection. (Legis. Counsel's Dig., Sen. Bill No. 1634, 4 Stats. 1978 (1977–1978 Reg. Sess.) 1978 Summary Dig., pp. 315–316.)

In 1986, the Legislature amended section 99152 to add a requirement that the PUC develop a "safety oversight program" to be met by the operators of those public transit guideways. (Stats. 1986, ch. 483, § 1, p. 1797.)

With this background in mind, we now turn to the question of whether the PUC's section 1201 and 1202 jurisdiction applies to the VTA.

---

[8] Recently, the Legislature found it necessary to expand the VTA's powers to address the area's changing needs. (§ 100001.5, added by Stats. 2001, ch. 217, § 1.)

## C. Standard of Review

Initially, the PUC asserts that its interpretation of sections 1201 and 1202 as applying to light rail transit crossings is entitled to "great deference." The VTA argues that the interpretation of the statutes is the subject of independent judicial review.

■ "An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, unlike quasi-legislative regulations adopted by an agency to which the Legislature has confided the power to 'make law,' and which, if authorized by the enabling legislation, bind this and other courts as firmly as statutes themselves, the binding power of an agency's *interpretation* of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation. . . . [¶] Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 [78 Cal.Rptr.2d 1, 960 P.2d 1031], original italics; see also *Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1096 [102 Cal.Rptr.2d 684].)

This case turns on statutory interpretation and issues of legislative intent underlying sections 1201 and 1202 as well as the VTA's enabling legislation and related statutes applicable to public light rail transit systems. Therefore, our review is independent review. (*Yamaha Corp. of America v. State Bd. of Equalization*, *supra*, 19 Cal.4th at pp. 7–8.)

■ " ' "A fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. [Citations.] In construing a statute, our first task is to look to the language of the statute itself. [Citation.] When the language is clear and there is no uncertainty as to the legislative intent, we look no further and simply enforce the statute according to its terms. [Citations.] [¶] Additionally, however, we must consider the [statutory language] in the context of the entire statute [citation] and the statutory scheme of which it is a part. 'We are required to give effect to statutes "according to the usual, ordinary import of the language employed in framing them." [Citations.]' [Citations.] ' "If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose." [Citation.] . . . "When

used in a statute [words] must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear." [Citations.] Moreover, the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole. [Citations.]' " ' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743 [110 Cal.Rptr.2d 828, 28 P.3d 876], quoting *Phelps v. Stostad* (1997) 16 Cal.4th 23, 32 [65 Cal.Rptr.2d 360, 939 P.2d 760].)

■ "We examine the statutes in their context and with other legislation on the same subject. [Citation.] If they conflict on a central element, we strive to harmonize them so as to give effect to each. If conflicting statutes cannot be reconciled, later enactments supersede earlier ones [citation], and more specific provisions take precedence over more general ones [citation]. Absent a compelling reason to do otherwise, we strive to construe each statute in accordance with its plain language. [Citation.]" (*Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 310 [99 Cal.Rptr.2d 792, 6 P.3d 713].)

■ "It is well settled that a later statute may supersede, modify, or so affect the operation of an earlier law as to repeal the conflicting earlier law by implication. [Citations.] 'The courts assume that in enacting a statute the Legislature was aware of existing, related laws and intended to maintain a consistent body of statutes.' [Citation.]" (*Orange County Air Pollution Control Dist. v. Public Util. Com.* (1971) 4 Cal.3d 945, 954, fn. 8 [95 Cal.Rptr. 17, 484 P.2d 1361].) "Where, as here, legislation has been judicially construed and a subsequent statute on the same or an analogous subject uses identical or substantially similar language, we may presume that the Legislature intended the same construction, unless a contrary intent clearly appears." (*Estate of Griswold* (2001) 25 Cal.4th 904, 915–916 [108 Cal.Rptr.2d 165, 24 P.3d 1191].)

■ Where the issue involves two potentially overlapping statutory schemes, "we must read the two statutes together and construe them so as to give effect, when possible, to all the provisions thereof. [Citations.] If the meaning of the statutory language is unclear, we turn to the Legislative history to determine intent, and we apply other traditional aids in statutory construction." (*De Anza Santa Cruz Mobile Estates Homeowners Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 909 [114 Cal.Rptr.2d 708].) "In such circumstances, we ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' " (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].)

### D. *Jurisdictional Analysis*

Looking first at the statutory language, we note that section 1201 speaks in terms of requiring the PUC's permission to construct roads or tracks across the tracks of any "railroad or street railroad corporation" and that section 1202 gives the PUC exclusive jurisdiction over the crossings of a "railroad or street railroad." In section 1219, the Legislature has expressly declared that sections 1201 to 1205 were enacted "as aids to the jurisdiction vested in the commission for the supervision, regulation, and control of railroad and street railroad corporations."

The Public Utilities Code contains general definitions for these terms. A "street railroad corporation" is generally defined to include "every corporation or person owning, controlling, operating, or managing any street railroad for compensation" (§ 232), and a "street railroad" is generally defined to include "every railway . . . being mainly upon . . . any street" (§ 231).[9] A "public utility" is generally defined to include, inter alia, "every common carrier" (§ 216), and "common carrier" is generally defined to include "every person and corporation providing transportation for compensation," including every "street railroad corporation" (§ 211, subd. (a)). A "corporation" is generally defined to include "a corporation, a company, an association, and a joint stock association." (§ 204.)

■ In contrast to these general definitions, the definitions contained within the VTA's enabling legislation govern its construction unless the context otherwise requires. (§ 100010.) ■ The VTA's enabling legislation defines "person" to include "any individual . . . [or] corporation . . . but does not include a public agency, as defined in this chapter." (§ 100019.) A "public agency" is defined in the enabling legislation to include, inter alia, "any . . . district . . . or public entity of, or organized under the laws of, this state. . . ." (§ 100016.) While the VTA arguably could be considered to be operating a "street railroad," it is a "public agency," not a "person" and arguably not a "corporation." While we recognize that the VTA conceivably

---

[9] Section 231 provides: " 'Street railroad' includes every railway, and each branch or extension thereof, by whatsoever power operated, being mainly upon, along, above or below any street, avenue, road, highway, bridge, or public place within any city or city and county, together with all real estate, fixtures, and personal property of every kind used in connection therewith, owned, controlled, operated, or managed for public use in the transportation of persons or property, but does not include a railway constituting or used as a part of a commercial or interurban railway."

Section 232 provides: " 'Street railroad corporation' includes every corporation or person owning, controlling, operating, or managing any street railroad for compensation within this State, or owning, controlling, operating, or managing as a part of or in conjunction with such street railroad any automobile, jitney bus, stage, or auto stage used in the business of transportation of persons or property for compensation over any public highway in this State between fixed termini or over a regular route."

could be characterized as a type of public corporation (see *Turlock Irrigation Dist. v. Hetrick* (1999) 71 Cal.App.4th 948, 952–953 [84 Cal.Rptr.2d 175]), it is not designated as such in its enabling legislation, and, regardless, it does not necessarily follow that the VTA should be considered a "street railroad corporation," which appears to be the target of section 1201 and section 1202 jurisdiction.

Construing this statutory language within the context of the statutory schemes, we believe that it is unclear from the statutory language alone whether the Legislature intended section 1201 and section 1202 to apply to a public transit district such as the VTA. Under the circumstances, we find the language of sections 1201, 1202, and 1219 ambiguous as to whether the PUC's section 1201 and section 1202 rail crossing jurisdiction applies to the light rail crossings of a public transit district. Therefore, it is necessary to turn to legislative history and other interpretive aids to resolve the issue of legislative intent.

As noted above, the Legislature granted the PUC exclusive railroad crossing jurisdiction under sections 1201 and 1202 long before it passed the enabling legislation for the VTA. Significantly, in the meantime, the PUC's jurisdiction over public transit was the subject of two California Supreme Court decisions, *Los Angeles Met. Transit Authority v. Public Utilities Com.* (1959) 52 Cal.2d 655 [343 P.2d 913] (hereafter *MTA I*), and *Los Angeles Met. Transit Authority v. Public Util. Com.* (1963) 59 Cal.2d 863 [31 Cal.Rptr. 463, 382 P.2d 583] (hereafter *MTA II*). These decisions are significant because they reveal the Legislature's historical treatment of public transit agencies and its view of the PUC's jurisdiction over such public agencies, as interpreted by the California Supreme Court. (See *County of Inyo v. Public Utilities Com.*, *supra*, 26 Cal.3d 154, 166.)

In *MTA I*, the Los Angeles Metropolitan Transit Authority (Authority) sought to annul a PUC order granting a certificate of public convenience and necessity to Charter Bus Transportation Company, which operated a privately owned transportation system. Charter Bus Transportation Company operated seasonal passenger stage services to several racetracks located in the vicinity of Los Angeles and sought to expand and operate a bus service to the home games of the Los Angeles Dodgers Baseball Club. The Authority contended that its enabling legislation precluded the PUC from authorizing new passenger stage operations in Los Angeles County. After analyzing the Authority's enabling legislation, the Supreme Court concluded that the PUC had the power to authorize privately operated public transit, and it affirmed the PUC order.

As discussed in *MTA I*, the original Los Angeles Metropolitan Transit Authority Act was enacted in 1951 (Stats. 1951, ch. 1668, p. 3804) and

expressly placed the Authority under the regulatory control of the PUC. When the Legislature originally placed the Authority under the control of the PUC, it expressly declared that it was making an exception to a long established policy. (Stats. 1951, ch. 1668, § 13.4, p. 3824; see *MTA I*, *supra*, 52 Cal.2d at p. 661, fn. 9, quoting 1951 legislative declaration.) However, the 1951 Act proved inadequate, and the Legislature passed the Los Angeles Metropolitan Transit Authority Act of 1957 (Stats. 1957, ch. 547, p. 1609), which greatly increased the powers of the Authority. (*MTA I*, *supra*, 52 Cal.2d at p. 659.) "The 1951 Act gave the Authority some of the foregoing powers, but expressly provided that it could exercise its powers only under the regulatory control of the Public Utilities Commission. The Authority's routes and rates, and contracts were also subject to control by the Public Utilities Commission. Under the 1957 Act the commission has no control over the Authority with respect to any of these matters. In the absence of legislation otherwise providing, the commission's jurisdiction to regulate public utilities extends only to the regulation of privately owned utilities." (*Id.* at p. 661, fns. omitted.)

Four years later, in *MTA II*, the Authority challenged the validity of a PUC order requiring it to comply with safety rules and regulations contained in PUC General Order No. 98. The order challenged by the Authority was entered by the PUC pursuant to the mandate of a 1961 amendment to the 1957 Act. The Authority contended that the California Constitution allowed the Legislature to grant the PUC regulatory jurisdiction over private transportation utilities only and prohibited the PUC from exercising jurisdiction over public transportation companies such as the Authority. (*MTA II*, *supra*, 59 Cal.2d at pp. 865–866.) The Supreme Court concluded that the Legislature could constitutionally grant the PUC regulatory jurisdiction over the Authority's safety practices. (*Id.* at p. 870.)

As discussed in *MTA II*, the Los Angeles Metropolitan Transit Authority Act of 1957 expressly required the Authority to "adopt and comply with safety regulations prescribed by the Public Utilities Commission applicable to comparable street railway and bus systems" (Stats. 1957, ch. 547, § 3.11, p. 1617), and pursuant to a 1961 amendment, the Authority was expressly made subject to the PUC's jurisdiction "with respect to safety rules and other regulations governing the operation of passenger stage corporations and street railroad corporations as contained in General Order No. 98. . . ." (Stats. 1961, ch. 1571, § 1, p. 3396; *MTA II*, *supra*, 59 Cal.2d at p. 866.) As observed in *MTA II*, "many area-wide public transportation authorities are presently being established to solve the transportation problems of metropolitan regions. It would appear that the Legislature has determined that the safety of operators and passengers of the petitioning metropolitan public authority can best be

assured if limited regulatory jurisdiction over safety practices is conferred upon respondent commission." (*MTA II, supra,* at pp. 869–870.)[10]

The PUC relies on the Supreme Court's decision in *MTA II, supra,* 59 Cal.2d 863 in support of its position that public agencies can be street railroad corporations subject to its section 1202 jurisdiction. The PUC asserts that the fact that the VTA is publicly owned does not prevent it from being a street railroad corporation or common carrier subject to the PUC's regulation.

A close reading of *MTA II* reveals that the critical issue decided in that case was whether the California Constitution *prohibited* the Legislature from granting the PUC jurisdiction over the transit authority. (See *MTA II, supra,* 59 Cal.2d at p. 868.) The statute at issue in *MTA II* expressly and specifically conferred such regulatory power over the safety aspects of the transit authority's operations, and the Supreme Court concluded that the Legislature lawfully granted the PUC regulatory jurisdiction over the transit authority's safety practices. (*Id.* at p. 870.)

In reaching its decision, the Supreme Court found that the California Constitution did not restrict the Legislature from conferring PUC jurisdiction over a common carrier, however it is organized. The fact that the transportation authority was a publicly owned, as opposed to a privately owned common carrier, did not take it out of the general category of common carrier. (*MTA II, supra,* 59 Cal.2d at pp. 868–869.) In fact, the Legislature has conferred regulatory jurisdiction over publicly owned common carriers by enactment of sections 100168, 778, and 99152.

However, even assuming that the Legislature could extend the PUC's section 1202 exclusive railroad crossing jurisdiction to cover the light rail transit crossings of the VTA or any other transit district in the state, this does not mean that the Legislature has done so or ever intended to do so. Hence, the PUC's reliance on *MTA II* is misplaced. Rather, we read *MTA II* as actually supporting the VTA's position since the case affirmatively demonstrates that when the Legislature has intended to confer PUC jurisdiction over a publicly owned common carrier, it has specifically and expressly done so.

Against this backdrop, the Legislature passed the VTA's enabling legislation in 1969, expressly conferring PUC jurisdiction over the VTA's safety appliances and procedures pursuant to section 100168. The Legislature then

---

[10] The Los Angeles Metropolitan Transit Authority was succeeded by and merged into the Southern California Rapid Transit District in 1964. (See §§ 30001, 31000 et seq.) In 1992, the Legislature created the Los Angeles County Metropolitan Transportation Authority as the successor agency of the Southern California Rapid Transit District and the Los Angeles County Transportation Commission. (§§ 130050.2, 130051.13.)

followed up by passing statutes expressly vesting additional safety related jurisdiction in the PUC, including the addition of section 778 in 1976, the addition of section 99152 in 1978, and the related amendment of section 99152 in 1986, all of which admittedly apply to the VTA.

The Legislature's historic treatment of this subject area demonstrates that the Legislature has taken great care in crafting the enabling legislation for transit districts. In the case of the VTA, the Legislature has included express provisions vesting PUC jurisdiction over certain aspects of the VTA's operations. Here, in the absence of an express provision, we will not infer a legislative intent to confer PUC jurisdiction over a transit district. (See *Orange County Air Pollution Control Dist. v. Public Util. Com., supra,* 4 Cal.3d 945, 953–954.) Rather, PUC jurisdiction over a transit district must be clearly provided by statute. If the Legislature had wanted sections 1201 and 1202 to apply to transit districts, it could simply have said so. " '[T]he judicial role in a democratic society is fundamentally to interpret laws, not to write them.' " (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175].) When the Legislature has intended to grant the PUC jurisdiction over transit districts or public light rail transit systems, it has passed express legislation doing so. Viewed in such context, we cannot discern any legislative intent, express or implied, to impose the PUC's section 1201 and section 1202 exclusive railroad crossing jurisdiction on the VTA. We do, however, respectfully invite the Legislature to amend the statutory scheme if it determines that the issue requires clarification.

Finally, we believe that our interpretation is consistent with the Legislature's ongoing attempts to address the changing transportation needs of various areas of the state. (See, e.g., § 100001.5 [legislative findings and declarations expressing changing transportation problems and the need to vest additional authority in the VTA to solve transportation problems].) As times have changed, the Legislature has altered the express scope of the PUC's jurisdiction over transit districts and public transit in the Legislature's ongoing attempts to address the transportation problems facing the state. (See, e.g., *MTA I, supra,* 52 Cal.2d 655; *MTA II, supra,* 59 Cal.2d 863.) The Legislature has addressed itself to the issue of PUC jurisdiction over publicly owned common carriers by enacting specific and express provisions granting the PUC jurisdiction over limited matters when it has deemed it fit to do so. Sections 1201 and 1202 simply do not fall into such category of legislation.

Under the circumstances, we find that sections 1201 and 1202 do not apply to the VTA. Therefore, while the PUC has safety jurisdiction over the VTA's light rail transit crossings under section 99152, the PUC does not have exclusive railroad crossing jurisdiction over these crossings pursuant to sections 1201 and 1202.

## IV. DISPOSITION

Public Utilities Commission Decision Nos. 02-12-053 and 03-05-081 are annulled in part. The decisions are annulled to the extent that the commission found that it has exclusive railroad crossing jurisdiction over the Santa Clara Valley Transportation Authority's light rail transit crossings pursuant to Public Utilities Code sections 1201 and 1202.

Mihara, J., and McAdams, J., concurred.

A petition for a rehearing was denied December 14, 2004, and respondent's petition for review by the Supreme Court was denied March 16, 2005. Brown, J., did not participate therein.